UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

United States of America

                                        CR-06-0154 (CPS)

   - against -                          MEMORANDUM OPINION
                                        AND ORDER

Khalid Awan,

                            Defendant.

----------------------------------------X

SIFTON, Senior Judge.

On October 30, 2006, defendant, Khalid Awan entered a plea

of not guilty in response to a superseding indictment charging

him with (1) one count of conspiring to provide material support

and resources, knowing and intending that such support would be

used in preparation for and in carrying out a conspiracy to

murder, kidnap or maim a person or persons outside of the United

States, in violation of 18 U.S.C. § 2339(A) and 18 U.S.C. §

956(a), (2) one count of actually providing material support and

resources, knowing and intending that such support would be used

in preparation for and in carrying out a conspiracy to murder,

kidnap or maim a person or persons outside of the United States,

in violation of 18 U.S.C. § 2339(A) and 18 U.S.C. § 956(a), and

(3) one count of knowingly and intentionally transporting,

transmitting and transferring monetary instruments and funds from

a place in the United States to a place outside the United States, with the intention of promoting an offense against a foreign nation, involving murder and destruction of property by means of explosive or fire in violation of 18 U.S.C. § 1956(c)(7)(B)(ii).  Now before the Court are defendant's motions (1) to suppress evidence and[1] (2) to suppress statements.  A hearing was held on this motion on September 18, 2006.  On the basis of the findings of fact and conclusions of law and for the reasons set forth below, defendant's motions to suppress evidence and statements are denied.

## BACKGROUND

*Initial Arrest and Collection of Physical Evidence*

On October 25, 2001, FBI agents conducting an investigation into the events of September 11, 2001 arrested Khalid Awan at a house in Garden City, New York on a charge of credit card fraud. During the course of that arrest, defendant signed a consent to search at the request of Agent Anthony Jackson for the Garden City location.  When it became apparent to the agents that the defendant might be staying at a house in Floral Park, New York,

---

[1]  Additional motions relating to this case are pending before this Court, including a motion to exclude government's expert witness and a motion to admit 404(b) evidence.

owned by Iftikhar Mian, who was present at the Garden City residence at the time of defendant's arrest but was not himself arrested, Agent Jackson requested and received defendant's verbal consent to search any of his personal property found there. Agents then followed Mian to the house at 38 Whitney Place, Floral Park, New York, and, after obtaining Mian's written consent to a search, found several bags belonging to defendant pointed out by Mian.  The bags were thereafter removed from the Floral Park residence and brought to the F.B.I. office where defendant, having waived his *Miranda* rights, was undergoing questioning.  Defendant was then presented with a written consent to search the bags found at the Floral Park house, which he signed.  The bags were then searched.

As a result of the search of the bags the government has in its custody and intends to offer into evidence at trial (1) credit cards and ID cards in the name of Khalid Awan; and (2) a CD labeled "Khalid Awan Document Copies."  The prosecution also intends to offer a document entitled, "United States Department of Justice, Federal Bureau of Investigation, receipt of Property Received," dated October 25, 2001, listing property taken from

the residence at Floral Park.  No search warrant was obtained

prior to the search of the Floral Park residence.[2]


*Material Witness Warrant and Credit Card Fraud*

Subsequent to his initial arrest, defendant was held for a

period of time pursuant to a material witness warrant in

connection with an investigation concerning the events of

September 11, 2001.  On November 6, 2001 defendant testified in

front of a federal grand jury as a material witness.  However, he

was not thereafter released from custody, but continued to be

held in connection with the charge of credit card fraud.  On

November 14, 2001 defendant was arraigned on that charge before

United States Magistrate Judge Lindsey in this District.  At the

conclusion of that proceeding, defendant was ordered detained

pending trial.

Defendant thereafter retained counsel to handle his criminal

case.  He was indicted on credit card fraud charges on December

---

[2] Additional searches for defendant's property were also conducted
around the time of arrest, according to the papers filed with these motions.
However, the parties have stipulated that the only property which will be
offered into evidence is that seized from the Floral Park residence, rendering
issues concerning the legality of the searches at other locations moot.  The
government has also stated that it will not introduce evidence found during
searches of defendant's cell or prison mail, rendering defendant's motion with
regards to that evidence moot as well.

4, 2001; a superseding indictment was filed on May 7, 2002.  On March 17, 2003 defendant pleaded guilty to one count of credit card fraud in violation of 18 U.S.C. § 1029.  Defendant was sentenced on October 28, 2004 to sixty months incarceration.  A judgment of conviction reflecting that sentence was entered on November 8, 2004.

*Defendant's Incarceration and Statements*

During May 2004, defendant was being held at the Metropolitan Detention Center ("MDC") in Brooklyn, New York.  Defendant there encountered Harjit Singh, another inmate who was awaiting sentencing.  During their conversations, defendant told Harjit Singh that he knew a Pakistani terrorist named Paramjit Singh Panjwar ("Panjwar") leader of the Khalistan Commando Force ("KCF"), a Sikh terrorist organization which had conducted violent attacks against people and property in India.  Harjit Singh brought these conversations to the attention of the FBI.  To corroborate Harjit Singh's reports, between May 14 and May 16, 2004 the FBI arranged for Harjit Singh and defendant to be placed together in the detention facility and directed Harjit Singh to engage in recorded conversations with defendant, which he did.  Thereafter, on November 10, 2004, inmate Alejandro Gonzalez-Lupi

initiated and engaged in recorded conversations with defendant at the direction of the government at the federal prison in Allenwood, Pennsylvania. On neither occasion was defendant informed of the fact that the prisoners were cooperating with law enforcement.

On January 27, 2006 defendant, then serving his federal prison sentence in Allenwood, was transferred to the MDC pursuant to a subpoena to testify at grand jury hearings which led to the current indictment. On February 17, 2006, defendant was brought to the U.S. Attorney's Office for a pre-grand jury interview with FBI agents and investigators with the U.S. Attorney's Office; the interview was conducted by Investigator John Ross. At the U.S. Attorney's Office, defendant was given *Miranda* warnings in English and Urdu and signed waivers, agreeing to answer questions without an attorney present. At some point during the interview agents played a tape of defendant speaking with Panjwar and informed him that he was the target of an investigation regarding his association with a terrorist group in India. At the end of the interview, the government indicated that they would like to speak with defendant again and defendant agreed.[3] On February

---

[3] At some point during the interview on February 17, additional government officials came in to participate, including the prosecuting U.S. Attorney.

20, 2006 defendant was brought back to the same office.  He again signed *Miranda* waivers and the government continued the interview.

*The Current Indictment*

Defendant was scheduled to be released from his 2004 sentence in March, 2006.  However, on March 8, 2006 he was again indicted.  A superseding indictment was filed August 1, 2006 and a second superseding indictment filed October 23, 2006.  The three-count indictment second superseding reads as follows:

Count One:

> In or about and between 1998 and February 2005, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KHALID AWAN, together with others, did knowingly and intentionally conspire to provide material support and resources, to wit: currency, monetary instruments, financial services and personnel, knowing and intending that they were to be used in preparation for, and in carrying out, a conspiracy to commit at a place outside the United States an act that would constitute the offense of murder, kidnapping or maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of Title 18 United States Code, Section 956(a).

Count Two:

> In or about and between 1998 and November 6, 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KHALID AWAN did knowingly and intentionally provide material support and resources, to wit: currency, monetary

instruments, financial services and personnel, knowing and
intending that they were to be used in preparation for, and
in carrying out, a conspiracy to commit at a place outside
the United States an act that would constitute the offense
of murder, kidnapping or maiming if committed in the special
maritime and territorial jurisdiction of the United States,
in violation of Title 18 United States Code, Section 956(a).

Count Three:

In or about and between 1998 and November 6, 2001, both
dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendant KHALID
AWAN did knowingly and intentionally transport, transmit and
transfer monetary instruments and funds from a place in the
United States to a place outside the United States with the
intent to promote the carrying on of specified unlawful
activity, to wit: an offense against a foreign nation, to
wit: India, involving murder as defined by Indian Penal Code
Section 300 and destruction of property by means of
explosive or fire as defined by Indian Penal Code Section
435.

The government alleges, in its filings in connection with

this motion, that defendant transferred his own money and

assisted others in transferring money to the Khalistan Commando

Force ("KCF"), a Sikh separatist organization based in Pakistan.

Additionally, the government alleges that defendant recruited

fellow prison inmates to join the KCF.

Between August 4, 2004 until June 9, 2006, defendant placed

several calls from federal correctional facilities which were

recorded and which the government plans to introduce at the trial

of the present charges.  The phones at which the calls were made

had signs stating that every outgoing call would be recorded.  No
warrant was obtained for the taping of these phone calls.

Defendant was arraigned on the present charges on March 16,
2006, August 9, 2006 and October 30, 2006.  Trial is scheduled
for December, 2006.

## DISCUSSION

## I. SUPPRESSION OF PHYSICAL EVIDENCE

"Searches conducted outside the judicial process, without
prior approval by judge or magistrate, are per se unreasonable
under the Fourth Amendment -- subject only to a few specifically
established and well-delineated exceptions." *Katz v. U.S.,* 389
U.S. 347, 357 (1967).  One of those exceptions, relevant here, is
the voluntary consent of the suspect, so long as there is no
coercion and "the consent was a product of that individual's free
and unconstrained choice." *U.S. v. Garcia,* 56 F.3d 418, 422 (2d
Cir. 1995) (noting that the concept of a "knowing and intelligent
waiver" does not apply to the Fourth Amendment).  When the
government seeks to admit evidence pursuant to a consent search,
it "has the burden of proving consent voluntarily given by a
preponderance of the evidence . . . in light of the totality of

the surrounding circumstances." *U.S. v. Calvente,* 722 F.2d 1019,

1023 (2d Cir. 1983) (internal citations and quotations omitted).

This test for voluntary consent is an objective one, in

which courts must determine "whether the agents had a reasonable

basis for believing that there was valid consent to the search."

*U.S. v. Lavan*, 10 F.Supp.2d 377, 384 (S.D.N.Y. 1998) (citing *U.S.

v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)).

> In applying this test, it is appropriate to consider
> the particularities of the situation that is presented
> in any given case and the "possibly vulnerable
> subjective state of the person who consents." Other
> relevant factors are whether the defendant was in
> custody and in handcuffs, whether there was a show of
> force, whether the agents told the defendant that a
> search warrant would be obtained, whether the defendant
> had knowledge of the right to refuse consent, and
> whether the defendant previously had refused to
> consent.

*Lavan*, 10 F.Supp.2d at 384.


*A. Property Seized from the Floral Park Residence*

Defendant concedes that he consented to the search of his

property at the Floral Park residence before the officers went to

that location and he has not disputed that he also signed a

follow-up written consent for a search of the bags found at that

location.  Rather, defendant argues that his consent was

involuntary due to the coercive nature of the arrest.  On October 25, 2001 in question, five government agents arrived at the Garden City location during daylight hours to arrest the defendant pursuant to an arrest warrant for credit card fraud. The agents knocked on the door and the defendant answered and identified himself.  The agents advised him of the nature of the charge on which he was arrested and asked him to drop a letter cutter he was apparently holding.  He complied with the agents' request, at which point he was placed under arrest and placed in handcuffs.  "Everything was calm."  The agents then confirmed the identity of the defendant and Agent Jackson asked him for consent to search the house.  The defendant agreed and Agent Jackson brought an FBI consent form from his car, read it to the defendant and had the defendant read it.  Agent Jackson informed the defendant that he had the right to refuse consent, a fact also stated on the consent form.  After confirming that the defendant understood the form, Agent Jackson then asked the defendant to sign it.  The defendant appeared responsive and otherwise capable of understanding them in English and the defendant never indicated otherwise.  After searching the residence and learning that the defendant may have been staying at the Floral Park residence, Agent Jackson then asked for and

received verbal consent from the defendant to search that

location as well.  During all these interactions, Agent Jackson

never drew his gun, and none of the other agents threatened him

with their guns, which were unholstered while the other agents

were performing a protective sweep of the residence.

Under such circumstances there is no reason to conclude that

the defendant's consent was involuntarily. *See U.S. v. Puglisi,*

790 F.2d 240, 244 (2d Cir. 1986); *U.S. v. Rojas*, 906 F.Supp. 120,

127 (E.D.N.Y. 1995); *U.S. v. Monsalve,* 728 F.Supp. 212, 218

(S.D.N.Y. 1990); *U.S. v. Murphy,* 16 F.Supp.2d 397, 401 (S.D.N.Y.

1998).  Although the defendant was handcuffed,[4] the arresting

---

[4] Though defendant says that initial handcuffing of the defendant and the subsequent extended handcuffing at an FBI facility "puts this case on par" with others in which the Second Circuit has found a lack of voluntary consent, that argument is unpersuasive.  In each of the cases other factors were involved, including, in each case, a finding by the court that the defendant was not made aware that he could refuse to consent; here, the defendant was made aware of his right to refuse consent prior to signing the written consent.  *See U.S. v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (upholding district court's finding that a search was coercive where, among other factors, significant time elapsed between when the agents entered the home and when they asked for defendant's consent during which the defendant was handcuffed, the defendant was a non-native English speaker, and the defendant was not informed of his right to refuse consent); *U.S. v. Vasquez,* 638 F.2d 507, 526-27 (2d Cir. 1980)  (finding no valid consent where the search was presented to the defendant as a "fait accompli" and where defendant was told that if he interfered he would be subject to physical force; though the case notes that the defendant told the officers that he would consent to search if they removed his handcuffs, that fact was not a factor in the court's decision); *U.S. v. Ruiz-Estrella*, 481 F.2d 723, 728 (2d Cir. 1973) (no inference of valid consent for a bag search where suspect, who had not been informed of his right to refuse a search, was taken by a uniformed officer from the boarding area and brought to a stairwell where the door was closed; the case mentions neither handcuffs nor holding at a traditional law enforcement facility); *U.S. v. Sanchez*, 635 F.2d 47, 56 (2d Cir. 1980) (court did not determine whether there was consent but rather remanded for reconsideration as to whether defendant believed he had no choice but to

agents did not enter the home by force, the defendant was never threatened or shouted at, and weapons were used not against the defendant but as a precaution against others who might be discovered during the protective sweep.  The environment was calm and the defendant compliant.[5]  The defendant was informed of his right to refuse consent both on the consent form and verbally by Agent Jackson.  Given the totality of these circumstances, it was objectively reasonable for Agent Jackson to believe the consent was voluntarily given for a search of the Floral Park residence at the time of the arrest and the search of his property discovered during the search of that premises.

Defendant also argues that the government has (1) failed to prove that Mian consented to a search of the Floral Park residence and (2) that Mian had sufficient control or ownership authority to consent to a search of that residence.  However, as

---

consent in a case where the district court failed to fully evaluate the words or manner of the officer when he requested consent, the fact that the officer had defendant's keys, and the fact that as the officer asked for consent he held the keys in his hands; though the defendant was handcuffed prior to the request for consent, the court made no findings as to the relationship between that handcuffing and the consent); *see also U.S. v. Kon Yu-Leung,* 910 F.2d 33, 41 (2d Cir. 1990)(noting that a finding of coercion does not follow from the fact that defendant was in handcuffs).  While handcuffing is a factor to consider, it is not necessarily dispositive.

[5] The government states in its papers that *Miranda* warnings were also given, though Agent Jackson himself did not recall whether that was the case. The defendant has not alleged anything with regard to whether *Miranda* warnings were given.  *Miranda* warnings are not required prior to a consent search, even when a defendant is in custody. *U.S. v. Moreno,* 897 F.2d 26, 33 (2d Cir. 1990).

noted above, Mian himself signed a written consent to search. At the time of arrest, the defendant himself characterized that location as Mian's home and informed Agent Jackson that he was staying there with Mian, which is supported by the fact that Mian led agents to the home, let them in and knew where defendant's personal property was located in the house, which consisted of several bags. As for the question of whether Mian had sufficient control of the Floral Park residence to grant consent, "[m]utual use of property, or joint access or control of property, is generally sufficient" to find that a third-party had a sufficient relationship with property to validly consent to a search. *U.S. v. Trzaska*, 859 F.2d 1118, 1120 (2nd Cir. 1988); *see also U.S. v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995). Applying this rule, courts in this circuit have regularly upheld searches of defendants' private spaces within a home where another occupant of the home consented to the search. *See U.S. v. Cataldo*, 433 F.2d 38, 40 (2d Cir. 1970); *U.S. v. Jenkins*, 496 F.2d 57, 72 (2d Cir. 1974); *Trzaska*, 859 F.2d at 1121. Moreover, if Mian did not actually have such access and control, evidence will not be suppressed where it "was reasonable for the officers to believe [the consenting third-party] had the requisite relationship" to the property. *Elliott*, 50 F.3d 180 at 185; *see also U.S. v.*

*Perez*, 948 F.Supp. 1191, 1201 (S.D.N.Y. 1996); *U.S. v. Lavin*, NO. 92 CR. 326 (JFK), 1992 WL 373486, at *6 (S.D.N.Y. Nov 30, 1992). Here, after being told that the residence belonged to Mian and that he lived there with Mr. Awan as his guest, it was clearly reasonable for agents to conclude that Mian had authority to consent to a search of the house.


**II. SUPPRESSION OF STATEMENTS**

*A. Statements of May 14 - 16, 2004 and November 10, 2004: Sixth Amendment Claims*

In *Massiah v. U.S.*, 377 U.S. 201 (1964), the Supreme Court ruled that after a defendant has been indicted, statements deliberately elicited by federal agents in the absence of counsel violate the Sixth Amendment and may not be used against the defendant. *Id.* at 206. As the Second Circuit has said, "[t]he Sixth Amendment bars the government from planting an agent to elicit jailhouse admissions from an indicted defendant who has asserted his right to counsel." *U.S. v. Birbal,* 113 F.3d 342, 345 (2d Cir. 1997). However, *Massiah* only extends to statements made which relate to the specific crime for which the defendant has retained counsel and not to statements made relating to uncharged conduct. *See Maine v. Moulton*, 474 U.S. 159, 180 n.16 (1985)

("[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses"); *Moran v. Burbine,* 475 U.S. 412, 431 (1986)(noting that the Supreme Court has made clear that *Massiah* only goes so far and that "evidence concerning the crime for which the defendant had not been indicted - evidence obtained in precisely the same manner from the identical suspect - would be admissible at a trial limited to those charges" because the right to counsel had not yet attached). In *Illinois v. Perkins*, 496 U.S. 292 (1990), the Court explicitly stated that *Massiah* was inapplicable to a situation where a defendant was interrogated in his jail cell by an undercover officer with regards to a crime which had not yet been charged since no Sixth Amendment right had attached at that point.

Defendant does not contend that charges had been brought in the current case at the time of these statements. Rather, he argues that *Massiah* applies to this case since his Sixth Amendment right to counsel had already attached at the time he made the jailhouse statements in May and November 2004 since the currently charged conduct is related to the credit card charges under which he was charged in 2002, because of the possibility of

overlapping evidence and witnesses and similar charges; the

charges, he says, are "not hermetically sealed, but are so

intertwined" as to mandate a finding that Defendant's Sixth

Amendment rights attached.[6]  Elsewhere in the motion papers,

defendant appears to also argue that his right to counsel

attached in 2001 with regards to the material witness warrant and

still applies to the present charges.

Defendant's arguments misstate the rule in these cases.  The

deciding factor as to whether the right to counsel applies is

whether an offense has yet been charged, not whether a later

offense is somehow related to an earlier charge.[7]  Indeed, the

Supreme Court has explicitly said that when a second, uncharged

offense is related to a charged offense, the right to counsel

does not apply to that uncharged offense if it would be not

considered the "same offense" under the Double Jeopardy test of

*Blockburger*, i.e. if each offense requires proof of a fact not

---

[6] The 5 count 2002 indictment charges: (A) Conspiracy to fraudulently use credit cards, in violation of § 1029(a)(2), for the period of January 1999 to April 2002; (B) Fraudulent use of credit cards, in violation of § 1029(a)(2), for the period of May 2000 to May 2001; (B) Fraudulent use of credit cards, in violation of § 1029(a)(2), for the period of April 2001 to December 2001; (D) Fraudulent use of credit cards, in violation of § 1029(a)(2), for the period of June 2001 to October 2001; and (E) Conspiracy to commit money laundering through the deposit and withdrawal of the proceeds of the credit card fraud, in violation of § 1956(a)(1)(A)(I), for the period between January 1999 to December 2001.
[7] To avoid confusion, I also note Investigator Ross's testimony that cooperating inmates were explicitly instructed to avoid discussions regarding the previous credit card charge.

present in the other. *Texas v. Cobb,* 532 U.S. 162, 172–173

(2001); *see also U.S. v. Mills,* 412 F.3d 325 (2d Cir. 2005).

Closely related conduct is not sufficient to carry over the right

to counsel from one offense to another.

There is clearly no "same offense" under *Blockburger* here.

In Counts One and Two of the current indictment, the government

must prove that defendant provided the "material support . . .

knowing and intending" that it be used to prepare for "a

conspiracy to commit . . . an act that would constitute the

offense of murdering, kidnapping or maiming," while the 2002

indictments do not contain any such elements in either 18 U.S.C.

§ 1029(a)(2)[8] or 18 U.S.C. 1956(a)(1)(A)(I).[9]  The 2002

indictments require findings of "intent to defraud," the use of

---

[8] In relevant part, the statute reads: "Whoever . . . knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices . . . shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section." 18 U.S.C. § 1029(a)(2).

[9] In relevant part, the statute reads:

 Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced . . .

18 U.S.C. § 1956(a)(1)(A)(I).  The "specified unlawful activity" defendant was charged with was fraud in connection with access devices under § 1029, which is one of the activities defined by reference as a "specified unlawful activity" in § 1956(c)(7)(A), incorporating "act or activity constituting an offense listed in section 1961(1) of this title" (18 U.S.C. § 1961(1) includes § 1029 in its list of offenses).

"counterfeit access devices," and the knowing use of "proceeds of

a specified unlawful activity" to "promote the carrying on" of

the fraud (for the § 1956 charge), which are not elements under

Counts One and Two of the current indictment.

As for Count Three, the charge requires proof that the

defendant intentionally "transport[ed], transmit[ted], or

transfer[ed]" funds "to a place outside the United States," with

the intent to "promote the carrying on of . . . an offense

against a foreign nation . . . involving murder . . . and

destruction of property," elements nowhere in the 2002 charges.

Again, the 2002 indictments require findings of "intent to

defraud," the use of "counterfeit access devices," and the

knowing use of "proceeds of a specified unlawful activity"  to

"promote the carrying on" of the fraud, which are not elements

under Counts Three.[10]  Since all Counts of the current indictment

allege elements not present in the 2002 indictments and visa

versa, there is no Double Jeopardy under the *Blockburger* "same

offense" test, and, accordingly, any right to counsel which

---

[10] I note here that the contention that both the prior and current
charges involve "money laundering" is misleading.  Looking at the statute
involved reveals that the charges are entirely unrelated.  The 2002 indictment
involves § 1956(a)(1)(A)(I) and (c)(7)(A), relating to the laundering of funds
obtained from illegal activities (specifically credit card fraud) to promote
the carrying on of that activity, while the current indictment charges a
violation of § 1956(a)(2) and (c)(7)(B)(ii), relating to the transfer of funds
to locations outside the United States for the purpose of promoting a violent
offense against a foreign nation.

applied in the 2002 case does not attach to the charges that were the subject of these jailhouse discussions, even if the new charges may share some factual and legal connection with the 2002 charges.  As for the material witness warrant, defendant was detained (and never charged) in relation to an investigation into the September 11, 2001 terrorist attacks in New York.  Such an investigation is distinct from the charges here, which allege sending funds and money, both before and after that date, to support attacks carried out in India.  Since the defendant was not yet indicted on the current charges at the time he made these statements to the cooperating witnesses and the current charges are not the same offense charged previously, he had no Sixth Amendment right to counsel and the statements will not be suppressed on these grounds.

*B. Statements of May 14 – 16, 2004 and November 10, 2004: Fifth Amendment Claims*

Defendant argues that his Fifth Amendment rights were violated when he was sent to administrative detention to meet with Harjit Singh.  Defendant claims that the psychological stress of being placed in that location created such fear and apprehension that any conversation he entered into while there

could not, on the totality of the circumstances, be characterized as resulting from a reasoned and voluntary decision on his part.[11]

However, the Supreme Court has ruled that "[w]here the suspect does not know that he is speaking to a government agent there is no reason to assume the possibility that the suspect might feel coerced" in violation of his Fifth Amendment rights. *Perkins*, 496 U.S. at 299-300. Indeed, "[p]loys to mislead a suspect or lull [a defendant] into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns," and therefore "[u]ndercover agents need not give *Miranda* warnings to incarcerated suspects." *Id.* at 297, 299-300. In other words, while the Fifth Amendment protects against coerced testimony, "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." *Id.* at 296; see also *Alexander v. State of Conn.*, 917 F.2d 747, 751 (2d Cir. 1990) (finding no coercion when an inmate freely confessed information to a friend where the inmate had no reason to suspect that his friend was cooperating with police, even though police had supported and

---

[11] The defendant has alleged no facts that distinguish this custodial context from all others other than the fact that some referred to administrative detention as "the hole."

encouraged the conversations and noting that "[d]eception which takes advantage of a suspect's misplaced trust in a friend does not implicate the right against self- incrimination nor the fifth or six amendment rights to counsel").  Moreover, the Second Circuit has stated that the mere fact of being in custody is not itself sufficient for a finding of coercion. *U.S. v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004); *see also U.S. v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988); *U.S. v. Newton*, 369 F.3d 659, 670 (2d Cir. 2004).

*C. Statements of May 14 – 16, 2004 and November 10, 2004: Equal Protection Claims*

Defendant claims that allowing the government to use the type of interrogation techniques described above subverts the *Miranda* rights a suspect would have in a face-to-face interrogation and thereby creates a "secondary interrogation classification with diluted constitutional protections" in violation of the principle of equal protection of the laws. Since the Supreme Court has explicitly approved of the use of such techniques, as described above, this argument requires no further discussion.

*D. Statements of February 17 and February 20, 2006*

The mere existence of a *Miranda* waiver does not prevent a
court from finding that a confession was involuntary and must be
suppressed. *See Dickerson v. U.S.*, 530 U.S. 428, 434 (2000).[12]
"A confession is not [voluntary] when brought about by
circumstances that caused the [suspect's] will to be overborne at
the time he confessed." *Green v. Scully*, 850 F.2d 894, 900 (2d
Cir. 1988). To determine voluntariness, the reviewing court must
apply a totality of the circumstances test to see if the
confession was truly the result of "free and unconstrained
choice." *Id.* at 900-01 (internal citations and quotations
omitted). In applying that test, the court must consider three
broad categories of circumstances: "(1) the characteristics of
the accused, (2) the conditions of interrogation, and (3) the
conduct of law enforcement officials." *Id.* at 901-02. More
specifically, courts commonly look at factors such as: the
suspect's experience, education, and background; the conditions
under which the suspect was questioned, including the location
and length of detention and the presence or absence of counsel;

---

[12] Defendant's argument that in *Rogers v. Richmond,* 365 U.S. 534, 544
(1961), the Supreme Court held that a threatening tactic violated the Fifth
Amendment is incorrect. The Court there reversed on the grounds that the
state court had not applied the proper test and explicitly stated that it was
not deciding anything about the voluntariness of the confession.

the nature of the questioning; whether suspect was informed of his constitutional rights; whether there was physical mistreatment or deprivation; and the use of "psychologically coercive techniques." *Id.* at 902.  It is the last of these factors which is primarily at issue here.

Defendant contends that even though he admittedly signed a waiver of his *Miranda* rights on February 17 and again on February 20, his rights under the Fifth and Sixth Amendments were violated because of the coercive nature of the interrogation.  Defendant notes that he is a Canadian citizen and a Muslim of Pakistani descent who had been incarcerated continually beginning in late 2001.  He also notes that he was transferred to the MDC in Brooklyn in January 2006 only weeks before the end of his jail term and contends that he was told that the transfer was for immigration issues.  Defendant further describes various statements made by the government officials in the room on February 17, both before and after the signing of the waiver, threatening the freedom of his family members and his own safety;[13] he notes that these family members lived in countries

---

[13] According to defendant, before he signed the waiver, the government threatened that if he did not talk they would arrest his wife and sisters and send him to India, where "you know better than I do what they can do to you." Later in the interview, according to the defendant, he was told by the prosecutor: "I can recommend lethal injection to the court and call the press and tomorrow morning you will be in every paper as a big terrorist."

(Canada and Pakistan) whose intelligence services work closely with the United States. According to defendant, it was as a result of these specific threats against family members that he signed the *Miranda* waiver on February 17 and again on February 20.

However, the government demonstrated at the hearing that at no point prior to the signing of the waiver on the February 17 was there any substantive discussion with the defendant and that the statements regarding the death penalty and defendant's family took place on February 20, *after* defendant had signed both waivers and only in response to concerns that the defendant did not understand the seriousness of the charges. Further, the government has shown that no other statements which could be understood as threatening were made at any other point during the interviews and that the government investigators tried to maintain a friendly atmosphere, removing the defendant's handcuffs, offering him drinks and even bringing in Arabic pastries.[14] As such, the evidence shows that at the time the

---

[14] To the extent that defendant argues that playing the tape of a call between defendant and Panjwar, which the government admits it did, created a coercive atmosphere, that argument fails. Under Second Circuit precedent, "[l]aw enforcement agents may tell the defendant about the evidence against him as well as the reasons why he should cooperate." *U.S. v. Berkovich,* 932 F.Supp. 582, 587 (S.D.N.Y. 1996); *U.S. v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) (once Miranda warnings are given, "agents [are] free to discuss with [suspects] the evidence against [them] and the reasons why [they] should cooperate"); *see also U.S. v. Major*, 912 F.Supp. 90, 95 (S.D.N.Y. 1996)

waivers were signed, the defendant was not under any duress or any other untoward influence.[15]  Accordingly, the statements therefore will not be suppressed on these grounds.

*E. Phone Calls from Jail*, *August 4, 2004 – June 9, 2006*

---

(truthfully informing suspect of the evidence against him and the legal consequences should he fail to cooperate "may have presented [the defendant] with a difficult and unpleasant decision" but was not coercive).

To the extent that defendant argues that informing him that he was being transferred for immigration purposes, if that indeed happened, undermines voluntariness, that argument also fails.  Even if a law enforcement official affirmatively lies to a suspect, that, without more, is not sufficient to find that statements were given involuntarily – the totality of the circumstances must still be considered. *Dallio v. Spitzer*, 170 F.Supp.2d 327, 340 (E.D.N.Y. 2001).  Here, the alleged lie was revealed before the defendant made any statements to the government, since Investigator Ross informed him of the charges against him immediately after the signing of the *Miranda* waiver, which explicitly explained that the defendant could choose to stop the questioning at any point.  Therefore, even if the defendant was lied to about the purposes of the transfer or the interview, since he was made fully aware of the nature of the charges before he started answering questions, his decision to respond to those questions was informed and voluntary. *See Garrett v. Smith*, NO. 05-CV-3374 (JFB), 2006 WL 2265094, at *10 (E.D.N.Y. Aug. 08, 2006) (finding that even if police had affirmatively misled the defendant as to the subject matter of the interrogation originally, the fact that the defendant was aware of the nature of the charges before he signed his second *Miranda* waiver led to a conclusion that his confession was voluntary).

[15] Although not discussed by the defendant, application of the other *Green* factors do not suggest that defendant's will was overborne.  The evidence has shown that Mr. Awan has some legal training, has been involved with the criminal justice system before and by all indications can speak English very well – he told the agents at the interview that he preferred to continue without a translator.  In addition, he was made aware of his Constitutional rights before both interviews, which were conducted in a room at the U.S. Attorney's office and lasted approximately five hours each, during which Mr. Awan was allowed to use the restroom.  The interviews were "very cordial" up until the point on the second day where the government realized that he did not understand the seriousness of the charges, and there are no allegations of any physical mistreatment.  While defendant was clearly without counsel during these sessions, that alone is not enough for a finding of involuntariness, especially considering that he had been given *Miranda* warnings. *See Green*, 850 F.2d at 903 (fact that defendant was separated from friends and legal counsel "dispelled" by the fact that he was given *Miranda* warnings).

Where a party to a phone conversation has given consent, the government may intercept such calls. *See* 18 U.S.C. § 2511(2)(c). Such consent may be express or implied. *U.S. v. Workman,* 80 F.3d 688, 693 (2d Cir. 1996). The Second Circuit has ruled that when a prisoner uses a telephone after receiving notice that he is being recorded, he is deemed to have consented. *U.S. v. Amen*, 831 F.2d 373, 378-79 (2d Cir. 1996); *see also Willoughby,* 860 F.2d at 19-20; *Workman,* 80 F.3d 688 at 693.

As noted above, the parties have stipulated that the phones used by defendant had signs which indicated that calls were being taped and defendant does not argue with the legal precedent either. Rather, defendant requests that this Court disregard that precedent and find that prisoners have a "more expansive zone of privacy." Defendant encourages this Court to find that "blanket warrantless recording of prisoner phone calls violates the right to free speech, to privacy, to be free from unreasonable searches and seizures, to due process, to equal protection, and to a fair trial under the First, Fourth, Fifth, and Sixth Amendments." Provided with nothing more than this request, there is no basis on which to challenge well-established precedent. Defendant was aware that his calls were monitored and

therefore gave his implicit consent when he placed them.  The

recordings of these calls will not be suppressed.


**CONCLUSION**

For the reasons set forth above, defendant's motions to

suppress evidence and statements are denied.  The clerk is

directed to furnish a copy of this opinion to all parties.



        SO ORDERED.

Dated :   Brooklyn, New York
          November 6, 2006

            By:  /s/ Charles P. Sifton (electronically signed)
                 United States District Judge