IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA (CPS) | \| | CRIMINAL NO. 1:06-CR-0154 |
| | \| | |
| | \| | The Hon. Charles P. Sifton |
| V. | \| | |
| | \| | |
| KHALID AWAN, | \| | |
| | \| | |
| Defendant. | \| | |

DEFENDANT'S POSITION ON SENTENCING

Defendant, KHALID AWAN, by and through undersigned counsel, files this, his position on sentencing, along with several letters, attached as exhibits A-G, written by members of Mr. Awan's family and one family photograph, attached as exhibit H. For the reasons stated below, Mr. Awan requests that this Court impose a sentence that is significantly less than the 45 years of imprisonment recommended by the Department of Probation. Ultimately, it is respectfully submitted that Mr. Awan should not forfeit his freedom for the remainder of his natural life. Rather, the Court, consistent with the directive in 18 U.S.C. § 3353(a), can fashion a sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing, but which is not disproportionately long and severe.

**I.     POST-*BOOKER* SENTENCING REQUIRES NON-WEIGHTED CONSIDERATION OF THE SEVEN FACTORS LISTED IN §3553(a) IN ORDER TO FASHION A SENTENCE "SUFFICIENT BUT NOT GREATER THAN NECESSARY" TO ACHIEVE THE STATUTORY PURPOSES OF SENTENCING**

1

**A.      The Dramatic Impact of *Booker, Crosby, Rita*, and *Claiborne* On the Issues Relevant to Mr. Awan's Sentencing**

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005) heralded the end of the federal Sentencing Guidelines (hereinafter "Guidelines") as a mandatory element of sentencing.  125 S. Ct. at 746.  That threshold substantive holding was joined by a "remedial" opinion that severed the sections of the Sentencing Reform Act (hereinafter "SRA") that made the Guidelines mandatory, id. at 756-57, and left the Guidelines themselves in place as just another of the seven considerations listed in 18 U.S.C. §3553(a) that a sentencing court must consider in the course of determining a sentence that is, according to §3553(a), "sufficient but not greater than necessary to comply with the purposes [of sentencing] set forth in" §3553(a)(2).  *See Simon v. United States*, 361 F. Supp.2d 35, 39, 47 (E.D.N.Y. 2005).

Regarding the "consideration" district courts must afford the Guidelines, in *United States v. Fleming*, 397 F.3d 95 (2d Cir. 2005), the Second Circuit relied on analogous provisions and cases [*i.e.*, 18 U.S.C. §3583(e)] in noting, for purposes of appellate review, that the cases "take a deferential approach and refrain from imposing any rigorous requirement of specific articulation by the sentencing judge."  397 F.3d at 99 (footnote omitted).  *See also United States v. Jaber*, 362 F. Supp.2d 365, 371 (D. Mass. 2005).[1]  In *Fleming*, the Court stated that "[a] court need not engage in ritualistic

---

[1]   Similarly, in *United States v. Lewis*, 424 F.3d 239 (2d Cir. 2005), regarding "departures," the Court clarified that "a court's statement of its reasons for going beyond non-binding *policy statements* in imposing a sentence after revoking a defendant's supervised release term need not be as specific as has been required when courts departed from *guidelines* that were, before *Booker*, considered to be mandatory."  424 F.3d at 245 (emphasis in original).  Consequently, since the Guidelines, too, are now, after *Booker*, "non-binding," a statement of reasons justifying a departure likely need not be as formal

2

incantation in order to establish its consideration of a legal issue. It is sufficient if, as in the case at bar, the district court rules on issues that have been fully presented for determination. Consideration is implicit in the court's ultimate ruling." 397 F.3d at 99 n.6.

Concerning the weight that a judge should give to the Guidelines, it is Mr. Awan's position that a Guidelines sentence should not be afforded any presumption of reasonableness. In addition, a district court should not use the Guidelines as a benchmark from which a sentence is crafted by tacking up or down from a Guideline level after examining the rest of the relevant sentencing factors under *Booker* and 18 U.S.C. § 3553(a). Treating the Guidelines as anything other than one of several non-weighted factors will violate Mr. Awan's Sixth Amendment right to a jury, as well as his Fifth Amendment right to due process, including his right to be sentenced on accurate information, to have fair notice, and to be free from burden shifting. *See, e.g. Claiborne v. United States*, 127 S. Ct. 551 (cert. granted Nov. 3, 2006)(decision below at 439 F.3d 479)(8th Cir. 2006)(granting *certiorari* on the following questions: (1) Was the district court's choice of a below-Guidelines sentence reasonable? (2) In making that determination, is it consistent with *Booker* to require that a sentence which constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances?); *Rita v. United States*, 127 S. Ct. 551 (cert. granted Nov. 3, 2006)(decision below at 2006 WL 1144508 (4th Cir. 2006)(granting *certiorari* on the following questions: (1) Was the district court's choice of within-Guidelines sentence reasonable? (2) In making that determination, is it consistent with *Booker* to accord a presumption of reasonableness to

_____

or detailed as it was when the Guidelines were mandatory.

3

within-Guidelines sentences? (3) If so, can that presumption justify a sentence imposed without an explicit analysis by the district court of the 18 U.S.C. § 3553(a) factors and any other factors that might justify a lesser sentence?).

In *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit addressed the new sentencing rubric under *Booker/Fanfan*. The Court emphasized its refusal to implement any firm controls on the district courts:

> [w]e need not on this appeal endeavor to determine what degree of consideration is required, or, to put it another way, what weight the sentencing judge should normally give to the applicable Guidelines range. We think it more consonant with the day-to-day role of district judges in imposing sentences and the episodic role of appellate judges in reviewing sentences, especially under the now applicable standard of "reasonableness," to permit the concept of "consideration" in the context of the applicable Guidelines range to evolve as judges faithfully perform their statutory duties. Therefore, we will not prescribe any formulation a sentencing judge will be obliged to follow in order to demonstrate discharge of the duty to "consider" the Guidelines.

397 F.3d at 113.

The Court need not formally decide whether certain circumstances qualify for departure: "close questions may sometimes arise as to the precise meaning or application of a policy statement authorizing a departure, and a judge who has considered policy statements concerning departures need not definitively resolve such questions if the judge has fairly decided to impose a non-Guidelines sentence." 397 F.3d at 112. *See also United States v. Hadash*, 408 F.3d 1080, 1083 (8th Cir. 2005) ("because the guidelines are now advisory, a reasonable departure is not limited solely to circumstances that the former mandatory guidelines framework would have deemed permissible bases for departure").

4

Consistent with *Booker* and the issues before the Supreme Court in *Rita* and *Claiborne*, Mr. Awan seeks an individualized sentence in which consideration of the Guidelines is not afforded a presumption of reasonableness and in which the Guidelines are considered no differently than the other non-weighted factors delineated under § 3553(a).

**B.      A Proposed Methodology for Sentencing In Light of *Booker, Crosby, Rita*, and *Claiborne***

As detailed below, while the Court in *Booker* provided almost no guidance to district courts with respect to post-*Booker* sentencing – other than to note that §3553(a) "remains in effect, and sets forth numerous factors that guide sentencing[,]" *Booker*, 125 S. Ct. at 766.

Reasonableness allows the District Court to exercise its discretion and apply the facts as heard at trial and not rely upon the description of the charges or the hyperbola of an indictment. *Booker* advises District Courts to avoid unreasonable sentences and will allow the trial court to lay the record as to why it finds a sentence reasonable. *Booker,* 125 S. Ct. at 765.

**1.      *Section 3553(a) Requires a Sentence "Sufficient But Not Greater Than Necessary" to Accomplish the Stated Purposes of Sentencing***

As a threshold matter, now that the Guidelines are advisory, they are no longer the guidepost for sentencing. Instead, the focal point is the instruction in the introductory paragraph of § 3553(a), which directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

Subsection 2, in turn, enumerates the following purposes:

(2) the need for the sentence imposed –

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2).

As discussed **post**, at Point III, in this case each of those criteria weigh considerably in Mr. Awan's favor, thereby making the appropriate and reasonable sentence here – one that is "sufficient but not greater than necessary" – a term of incarceration that is well below the Department of Probation's recommended Guidelines sentence of 45 years in prison.

### 2.  *Post-Booker Sentencing Requires Consideration of the Seven Factors Set Forth In §3553(a) Without Any Special Deference to the Guidelines*

Nor do the Guidelines (as advisory) occupy any superior position among the seven factors listed in §3553(a) that a court must consider in imposing sentence.  Those factors, with the exception of §3553(a)(2), which is set forth **ante**, and the reference to the Guidelines, at §3553(a)(4), and the Sentencing Commission's policy statements, at §3553(a)(5), are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; . . .
>
> (3) the kinds of sentences available; . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Indeed, §3553(a) does not provide any hierarchy, and if the order in which they appear is any indication, the Guidelines and the attendant policy statements – only two of the seven criteria – rank but fourth and fifth, respectively. As Justice Scalia noted in his dissent from the "remedial" opinion in *Booker*,

> [t]he statute provides no order of priority among all those factors, but since the three just mentioned [§§3553(a)(2)(A), (B) & (C)] are the fundamental criteria governing penology, the statute – absent the mandate of §3553(b)(1) – authorizes the judge to apply his own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the Guidelines.

125 S. Ct. at 790 (Scalia, J., *dissenting in part*).

*Crosby* makes the same point implicitly, but repeatedly, since each time the Court discusses the continuing need to "consider" the Guidelines with respect to sentencing, it does so in conjunction with the other factors enumerated in §3553(a). *See, e.g.*, 397 F.3d at 112 ("[o]nce an applicable Guidelines range has been determined, the sentencing judge will have the duty, imposed by subsection 3553(a)(4), to 'consider' it, *along with all of the factors listed in 3553(a)*")(emphasis added); *see also Booker*, 125 S. Ct. at 764 ("[w]ithout the 'mandatory' provision, the [SRA] nonetheless requires judges to take account of the Guidelines together with other sentencing goals") [*citing* §3553(a)];

7

*United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005); *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005).

In *United States v. Bliss*, 430 F.3d 640 (2d Cir. 2005), the Second Circuit reaffirmed that the factors in §3553(a), and not the Guidelines, are the focal point for sentencing by explaining that "pursuant to the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), a sentencing judge must now consider the factors specified in 18 U.S.C. §3553(a) and then decide whether to impose a Guidelines or non-Guidelines sentence." 430 F.3d at 652, *citing Crosby*, 397 F.3d at 110-12.

Thus, as the Court in *Crosby* explained, "[n]ow, with the mandatory duty to apply the Guidelines excised, the duty imposed by section 3553(a) to 'consider' numerous factors acquires renewed significance." 397 F.3d at 111. *Simon v. United States*, 361 F. Supp.2d at 40 (E.D.N.Y. 2005) (explaining why Court will afford equal, but not greater, weight to Guidelines vis-a-vis the other factors in §3553(a)).

In *United States v. Avello-Alvarez*, 430 F.3d 542 (2d Cir. 2005), the Court rejected the argument (made by the defendant) that a sentence was necessarily "unreasonable" (for purposes of appellate review after *Booker*) because it was different than that recommended by the Probation Department in the Pre-Sentence Report. 430 F.3d at 545.

While in *Avello-Alvarez* the sentence was *above* that recommended in the PSR, *id*., the reasoning applies with equal force to any sentence *below* that recommended in the PSR. Thus, here, a sentence below that recommended in the PSR would not be inherently "unreasonable."

The Court in *Crosby*, too, acknowledged the profound change in sentencing augured by *Booker*: "the change will affect the decision-making process of every district

8

judge in determining every sentence, even though the change in process might often not produce a change in result."  397 F.3d at 116; *see also* 397 F.3d at 106-07 (noting that *Booker* "will affect a large number of cases confronting the district judges of this Circuit almost daily . . . .").

As the Court in *Ranum* pointed out,

> [t]he directives of *Booker* and § 3553(a) make clear that courts may no longer uncritically apply the guidelines and, as one court suggested, "only depart . . . in unusual cases for clearly identified and persuasive reasons."  *United States v. Wilson*, [350 F. Supp.2d at 912].  The approach espoused in *Wilson* is inconsistent with the holdings of the merits majority in *Booker,* rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in *Booker,* directing courts to consider all of the § 3353(a) factors, many of which the guidelines either reject or ignore.

*Ranum*, 353 F. Supp.2d at 985-86.  *See also United States v. Williams*, 372 F. Supp.2d 1335 (M.D. Fla. 2005) (government shows disrespect for law in continuing to advocate guidelines sentences as the only reasonable sentence, contrary to *Booker* and the separation of powers doctrine);  *Jaber*, 362 F.3d at 371 ("as a practical matter, the *Wilson* method comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*");  *Simon v. United States*, 361 F. Supp.2d at 40 ("the greater the weight given to the Guidelines, the closer the Court draws to committing the act that *Booker* forbids – a Guideline sentence based on facts found by a preponderance of the evidence by a judge [citations omitted]. . .  Such a regime threatens a *de facto* mandatory sentence"); *United States v. Myers*, 353 F. Supp.2d 1026, 1028 (S.D. Ia. 2005) ("[t]o treat the Guidelines as presumptive is to concede the converse, *i.e.*, that any sentence imposed outside the Guidelines range would be presumptively unreasonable in the absence of

clearly identified factors . . . [and] making the Guidelines, in effect, still mandatory").

In fact, the following quotation from *Ranum* serves as a textbook example of how post-*Booker* sentencing involves consideration of a variety of factors that were expressly deemed non-pertinent under the Guidelines.  As the Court in *Ranum* explained,

> [f]or example, under § 3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, U.S.S.G. §5H1.1, his education and vocational skills, §5H1.2, his mental and emotional condition, §5H1.3, his physical condition including drug or alcohol dependence, §5H1.4, his employment record, §5H1.5, his family ties and responsibilities, §5H1.6, his socio-economic status, §5H1.10, his civic and military contributions, § 5H1.11, and his lack of guidance as a youth, §5H1.12.  The guidelines' prohibition of considering these factors cannot be squared with the §3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. The only aspect of a defendant's history that the guidelines permit courts to consider is criminal history.  Thus, in cases in which a defendant's history and character are positive, consideration of all of the §3553(a) factors might call for a sentence outside the guideline range.

*Id; see also Jaber*, 353 F. Supp.2d at 376 n. 21.

Ultimately, the Court in *Ranum* came full circle, noting that "in some cases the guidelines will clash with §3553(a)'s primary directive:  to 'impose a sentence sufficient, but not greater than necessary, to comply with the purposes' of sentencing."  *Id*. (footnote omitted).

Again, *Booker* is not a mandate to ignore the Guidelines in considering the appropriate sentence under the total rubric of §3553(a).  As the Court in *Crosby* cautioned, *Booker* and §3553(a) "do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."  397 F.3d at

10

113.  As a result, the Court continued,

> it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum.  On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a).

*Id.*;  *but see Booker*, 125 S. Ct. at 787 (Stevens, J., *dissenting in part*) (making Guidelines "advisory" renders them no more powerful than a "suggestion").

As *Crosby* reaffirms, in post-*Booker* sentencing, "[t]he sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  397 F.3d at 112.  As Judge Weinstein remarked in *United States v. Concepcion*, 795 F. Supp. 1262, 1278 (E.D.N.Y. 1992) *disapproved in United States v. DeRiggi*, 45 F.3d 713, 716-17 (2d Cir. 1995), a mandatory Guidelines system "does not allow courts to give meaningful consideration to all of the factors listed in section 3553(a).  Because those factors do not count as relevant data under the terms of the Guidelines, a sentencing court can bring them to bear in its Guidelines calculations only in relatively trivial ways."  *Booker* has now enabled sentencing courts to give the entirety of §3553(a) full meaning.  *See also Booker*, 125 S. Ct. at 785 n. 15 (Stevens, J., *dissenting in part*).

In the post-*Booker* sentencing environment, however, all of the traditional sentencing factors regain relevance and importance in informing the sentence imposed by a district court.

11

### 3. *Pre-Existing "Departure" Jurisprudence Is Not Determinative In Fashioning An Appropriate Post-Booker Sentence*

Since the yardstick is now a sentence "sufficient but not greater than necessary" to accomplish the stated goals of sentencing [in §3553(a)(2)], a factor need not qualify as a ground for "departure" in order to compel a non-Guidelines sentence, as long as it is encompassed within any of the other factors included in §3553(a). *See also United States v. Ryder*, 414 F.3d 908, 920 (8th Cir. 2005) (noting that previously prohibited grounds for departure could nevertheless justify a non-Guidelines sentence, on §3553(a) grounds, upon remand).

As the Court in *Ranum* elaborated,

> courts not imposing sentences within the advisory guideline range should provide an explanation for their decision. But in so doing courts should not follow the old "departure" methodology. The guidelines are not binding, and courts need not justify a sentence outside of them by citing factors that take the case outside the "heartland." Rather, courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the §3553(a) factors.

353 F. Supp.2d at 986-8*7; see also Crosby*, 397 F.3d at 112 n. 9.

In this case, the information provided **post**, at Point III, relates to the criteria in §3553(a), including, "the nature and circumstances of the offense and the history and characteristics of the defendant" [§3553(a)(1)], and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" [§3553(a)(6)], and the need "to promote respect for the law, and to provide just punishment for the offense" [§3553(a)(2)(A)].

Such information is also relevant to sentencing pursuant to the provisions of 18

U.S.C. § 3661, which directs that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Concepcion*, 795 F. Supp. at 1281 ("court should explore all relevant sources of information as mandated by §3661"), *disapproved in United States v. DeRiggi*, 45 F.3d 713, 716-17 (2d Cir. 1995).

Consequently, while, as detailed **post**, at Point III, even under pre-existing "departure" jurisprudence, a downward departure of several levels is warranted due to the factors present herein, even if it were not, those same circumstances nevertheless are more than sufficient to warrant a "non-Guidelines" sentence.

> **4.** ***Fleming and Crosby Afford District Courts Flexibility to Impose Individualized Sentences "Sufficient But Not Greater Than Necessary" Under §3553(a)***

Ultimately, as the Court in *Ranum* recognized, in "in every case, courts must now consider *all* of the § 3553(a) factors, not just the guidelines. And where the guidelines conflict with other factors set forth in § 3553(a), courts will have to resolve the conflicts." 353 F. Supp.2d at 986 (emphasis in original)*; see also Jaber*, 362 F. Supp.2d at 369 ("[t]he Guidelines and their policy statements are now factors to be weighed among the others")(footnote omitted).

Moreover, in *Fleming* and *Crosby*, the Second Circuit has unmistakably chosen a deferential standard with respect to the district courts' application of §3553(a)'s mandate to "consider" its factors (including the Guidelines), and to the standard of review ("reasonableness") of the sentence itself. *See also United States v. Brady*, 417 F.3d 326, 332 (2d Cir. 2005); *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005).

13

For example, in *Fleming*, the Court declared that "[a]s we have today noted, 'reasonableness' in the context of review of sentences is a flexible concept.  [*citing Crosby*].  The appellate function in this context should exhibit restraint, not micromanagement. . . .  we anticipate encountering such circumstances infrequently." 397 F.3d at 101.

The focus on individualized sentencing as a result of *Booker* was also remarked upon by the Second Circuit in *Crosby*:

> [w]e have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

397 F.3d at 114.

Here, it is respectfully submitted that due to Mr. Awan's several extraordinary circumstances, a punishment that fits the crime, as well as constitutes a sentence "sufficient but not greater than necessary" to accomplish the purposes of sentencing is, upon consideration of all of the factors listed in §3553(a), a non-Guidelines sentence significantly below 45 years of imprisonment.

## POINT III

**MULTIPLE FACTORS JUSTIFY EITHER A SUBSTANTIAL DOWNWARD DEPARTURE AND/OR NON-GUIDELINES SENTENCE WELL BELOW MR. AWAN'S GUIDELINES LEVEL**

As the legal analysis set forth above demonstrates, while the Guidelines remain a component of sentencing under §3553(a), they neither control the sentence determination, nor occupy any greater position within §3553(a) than any other of the enumerated factors. Also, while Guidelines departures are useful in determining the appropriate Guidelines

14

level and range, mitigating factors need not qualify formally as grounds for departure in order independently to justify a non-Guidelines sentence below the applicable range in order to achieve a sentence that is "sufficient but not greater than necessary" to accomplish the goals of sentencing.

Here, the factors relevant to Mr. Awan's sentencing either constitute downward departure grounds or provide ample reason for a non-Guidelines sentence significantly below the 45-year sentence recommended by the Department of Probation.  In light of all of the factors set forth in §3553(a), a sentence significantly below 45 years of imprisonment would constitute not only a sentence "sufficient but not greater than necessary" to achieve the objectives of sentencing, but also a "reasonable" sentence under post-*Booker* sentencing jurisprudence.  Indeed, among the criteria for sentencing set forth in §3553(a), *only* the Guidelines provides any rationale for a 45-year prison sentence for Mr. Awan; all of the other factors militate strongly against such a severe sentence.

**A.      The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Awan Justify a Sentence Less than Life Imprisonment**

### *i.      The Nature and Circumstances of the Offense*

"The nature and circumstances of the offense and the history and characteristics of the defendant[,]" 18 U.S.C. § 3553(a)(1), are relevant to meting out an appropriate sentence for Mr. Awan.

Even seen in a light most favorable to the government, the evidence at trial demonstrated that Mr. Awan was not a leader of the Khalistan Commando Force (KCF). The government's witnesses testified that Parmjit Singh Panjwar was the leader of the

KCF during all relevant times covered in the indictment.  The government's witness Baljinder Singh testified that Gurbax Singh was a principal leader of the KCF within the United States; Gurbax Singh testified that Baljinder Singh was selected to be a primary KCF fundraiser in the United States.  Although Gurbax Singh and Baljinder Singh testified about the various meetings they attended within the United States to raise funds for the KCF, both men testified that they did not know Mr. Awan except for seeing him one or two times.

Any involvement of Mr. Awan with the KCF certainly paled in comparison to the involvement of Gurbax Singh and Baljinder Singh.  Mr. Awan is not a Sikh and he does not participate in Sikh nationalist organizations.  No one at trial testified that Mr. Awan was a leader or organizer for the KCF or even the broader Khalistan liberation movement.

Mr. Awan was convicted of crimes involving the transfer of money.  The amount of money Mr. Awan conspired to transfer or actually transferred is still disputed, however the range varies from none to $2,000 to $4,000 to approximately $60,000.  At trial, Gurbax Singh and Baljinder Singh testified that they gave Mr. Awan no more than $2,000 (according to Gurbax) to $4,000 (according to Baljinder).  According the government's witnesses, Mr. Awan has not attempted to send money to Panjwar or the KCF since either in 2000 or 2001.  Although Mr. Awan has been in federal custody since October of 2001, there still is no credible allegation that Mr. Awan tried to funnel any money to the KCF since Mr. Awan has been in federal custody.

16

It is undisputed that Mr. Awan did not provide any arms or munitions to the KCF. Unlike Gurbax Singh, Mr. Awan personally never committed any acts of violence on behalf of the KCF.

It is respectfully submitted that the nature and circumstances of the crime are militated by the decision of the United States government not to designate the KCF as a terrorist organization. This reality speaks volumes and properly can be viewed as a tacit admission that the United States agrees that the struggle for a Khalistan homeland is predominantly political, not criminal.  That Pakistan, an ally of the United States and a recipient of significant American military aid, assists the KCF by providing military assistance also underscores that political nature of the struggle.

The jury did not make a specific finding that it found Mr. Awan guilty of conspiring to provide or of providing personnel to the KCF.  Even if the Court were to believe that Mr. Awan tried to recruit Harjit Singh to become a member of the KCF, the Court should consider that the government did not allege or provide any evidence that Mr. Awan tried to recruit any other people to become members of the KCF.

### ii.    The History and Characteristics of the Defendant

Regarding the "the history and characteristics of the defendant," several aspects of Mr. Awan's history and characteristics are pertinent, and justify a non-Guidelines sentence well below 45 years of imprisonment.

The Department of Probation has provided the Court a good deal of information concerning Mr. Awan's family ties, family responsibilities, community ties, mental and emotional health, physical condition, lack of substance abuse, education and vocational skills, employment record, and financial condition.  It is respectfully submitted that,

17

throughout his life, Mr. Awan has played a pivotal role in safeguarding and improving the lives of other human beings, particularly members of his family.

Mr. Awan is the eldest of four siblings; his three younger sisters are named Ghazala, Reheela, and Shamaila.  Mr. Awan grew up in Pakistan and excelled in school, eventually graduating from law school.

In describing Mr. Awan's younger years, his cousin Uzma Tahir writes:

> We spent our childhood together.  He always guided us in our studies and all other problems.  He can not see anyone in pain and has always been helping to others….  Just because of his obedience and caring caring attitude, he was a favorite boy from his childhood for all relative and friends.  He studied at Lahore and was a good student.  As he was the only son of his parents and only brother for his sisters, he has always been very loving for parents and sisters.  But he never took any advantages of that and always responded positively and proved himself a very caring and loving son and brother. . . .

Letter of Uzma Tahir, attached as exhibit A.

In 1983, Mr. Awan's father died, an event that had a profound impact on the emotional and economic stability of the family.  Twenty years old at the time, Mr. Awan assumed a primary role in the family, providing much needed economic and emotional support, especially to his mother and younger sisters.  Following the death of Mr. Awan's father, Mr. Awan's mother's physical and mental health steadily deteriorated until her passing in 1995 due to a brain hemorrhage.   Throughout this period, Mr. Awan took loving care of his sisters, becoming in their words "like a father."

In her letter to the Court, which is attached as exhibit B, Mr. Awan's sister Reheela writes:

> Our father died in Lahore, when we were too young to bear this incident.  Even Mr. Khalid Awan was only 20 years

18

old though he is older than all his sisters.  He also proved himself a very obedient and caring son.  Our mother became sick after her husband's death and this sudden and shocking incident really made her emotionally too weak.  Mr. Awan really showed great care morally and emotionally towards our mother.  He also managed her medical treatment very carefully and responsibly.  Though he visited Canada and US but was always present to take care of his mother in her sever illness.  Our mother had remained in comma for 6 months and Mr. Awan was by her side all the time, taking care of doctors' visit and her medicines/food.  I would say that it was not possible to face such trauma without Mr. Awan.  We never saw him go out throughout the time for any other activity.  He was really depressed and like us, wanted to see our mother well but that did not happen and she expired after facing long time sickness.

Once again, I would say that, for us, it was really impossible to face this sad event without help of our loving brother, who really took our great care after our mother's departure.

Mr. Awan's youngest sister, Shamaila, describes Mr. Awan's role in the family as follows:

Sir, Khalid Awan is not only my brother but I always feel that he is just like my father.  I was a kid when our father expired but since that time, Mr. Awan is there for me as an elder brother and as a father too. . . .

We strongly believe that we could not bear even our mother's illness and it was really impossible to face the sorrow of her death but Mr. Khalid made it possible for us to come out of this sorrow. . . .

Dear Sir, I can not bear the shock to live away from my father any more.  Yes I would add it again that Mr. Awan is just like my father because he always performed his duties like a father. . . .  Our lives are helpless without him.  We need him back as our brother and father.  For us, he is our shelter.

Letter from Shamaila Qayyum Awan, attached as Exhibit E.

Sentences of imprisonment play an important and valuable role in our justice

system.  Sometimes, however, our philosophical sense of individualism, particularly the

idea that personal responsibility leads to individual punishment for criminal behavior, can result in a diminished appreciation for how a person is part of a larger web of social ties. For some people who have spent years burning bridges with those close to them, a prison sentence will not emotionally impact anyone beyond the person being punished.  In other cases, particularly in situations where strong family ties remain intact, a prison sentence is not just a disbursement of individual punishment.  Instead, the punishment creates an irreparable tear in a larger social fabric.  The impact that a prison sentence has on the family of a person sentenced is not a reason to forego punishment --- far from it.  It is, however, a legitimate factor to be weighed by a court when determining the appropriate sentence that will be "sufficient but not greater than necessary."

Although Mr. Awan's family lives outside of the United States and could not attend the trial, various members of Mr. Awan's family have written the Court to express their feelings about sentencing.  Mr. Awan's sister, Ghazala writes the following:

> My elder brother who is the only one brother of mine named Khalid Awan is a very loving brother.  He has been always a very kind, loving and caring person throughout his life with all of us which includes my parents and other sisters. . . .  The news I heard about him being involved in crime and terror is totally unbelievable to me.  I even can not dream of any such crimes associated with Khalid.  I request you to be very kind to him.  Please try to take note that I am so much disturbed with this situation of my brother that now I am a patient of nerves damage for last four years.  My two daughters and husband are badly affected due to my sickness.  I am afraid that any more punishment to my brother may end my life or damage my nerve system so I may lose my senses.  It will hurt my family . . . . In the end I beg for mercy to my brother."

Letter of Ghazala Azmat, attached as Exhibit C.

Ghazala's husband of seventeen years, Azmat Elami, makes a similar plea:

20

> My wife has fallen sick since [Mr. Awan] is in prison and now I am afraid that any further punishment to Khalid may make life of my wife destroyed.  Please have pity on him.

Letter of Azmat Elami, attached as Exhibit D.

**B.**     **A Sentence of Less than 45 Years of Imprisonment Will Adequately and Reasonably Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

Considering that Mr. Awan has been incarcerated since October of 2001, a prison sentence in the range of five to ten years would adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  *See* 18 U.S.C. § 3553(a)(2)(A).

As described in III(A)(i) **ante**, by any rational evaluation Mr. Awan's role in the conspiracy was subsidiary to that of KCF leaders such as Gurbax Singh and Baljinder Singh.  Thus, because Mr. Awan should not be punished for exercising his right to go to trial, the Court should be open to sentencing Mr. Awan to a lesser term than the principals of the conspiracy, Gurbax Singh and Baljinder Singh.  A plea discount for the leaders of the KCF that would result in a lower sentence than for, at most, an ancillary middleman would not promote a respect for the law.  Also, it would not be in conformity with the Court's obligation to minimize sentencing disparities.

The charges for which Mr. Awan now stands convicted are serious charges, however Mr. Awan certainly is less culpable than Gurbax Singh and Baljinder Singh.  On the continuum of crimes that come before a federal court, the offenses in this case do not warrant a sentence on the extreme margins as recommended by the Department of Probation, particularly when the possible sentences for Gurbax Singh and Baljinder Singh are capped at 15 years.

21

Mr. Awan is 45 years old. His father died at age 52 of heart failure; his mother died at age 54 of a brain hemorrhage. Any sentence greater than 10 years realistically could result in Mr. Awan being imprisoned for the rest of his natural life.

Not only will Mr. Awan lose years of positive life experiences by being in prison, but arguably he will lose even more that the typical federal prison. Mr. Awan suffered particularly onerous pretrial detention conditions in while incarcerated in the Special Housing Unit of the Metropolitan Detention Center. Mr. Awan currently is prescribed Prozac for anxiety; he also receives medication for high blood pressure and for inflammation in his shoulder from an injury that, if he had been given proper physical therapy while in the SHU, might have healed months ago. These physical and mental ailments would seem to be directly related to the conditions of Mr. Awan's confinement.

A number of courts have previously held that pre-sentence confinement conditions may in appropriate cases be a permissible basis for a downward departure. *See United States v. McCarty*, 264 F.3d 191 (2d Cir. 2001); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996). *See also United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997). Again, a factor need no longer qualify as a ground for "departure" in order to compel a non-Guidelines sentence, as long as it is encompassed within any of the other factors included in §3553(a).

Upon serving time under sentence, Mr. Awan's mental, emotional, and physical health will be further stressed by the real possibility that the Bureau of Prisons will treat

Mr. Awan harshly because of his religious background and the nature of the charges for which he has been convicted. It is the understanding of undersigned counsel that, in order to isolate certain Muslim prisoners from the general federal prisoner population, the Bureau of Prison has begun housing a number of convicted Muslims in a prison in Indiana. Because there is a real possibility that Mr. Awan will live under conditions even more restrictive than those for the average federal inmate, each day of Mr. Awan's imprisonment can be equated to several days of typical imprisonment. The isolation, deprivation, and dehumanization caused by the conditions of Mr. Awan's imprisonment should be taken into account by the Court when determining how many more years of imprisonment Mr. Awan must endure.

All told, a sentence in the range of five to ten years will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

### C.    A Sentence of Five to Ten Years of Imprisonment Will Afford Adequate Deterrence to Criminal Conduct

A sentence in the range of five to ten years more than affords adequate deterrence to criminal conduct. Mr. Awan is now 45 years old and has been incarcerated since October of 2001. As stated above, Mr. Awan faces the possibility of having to surpass the age at which his parents died of natural causes before being released from prison.

Mr. Awan has lost and will continue to lose some of the most productive years of his life. A sentence in the range of five to ten years would send a strong signal that criminal conduct for which Mr. Awan has been convicted is not worth the risk. The prospect of spending a substantial portion of adult life in prison is sufficient general deterrence. The threat of a lifetime in prison is of less than marginal value in increasing

23

deterrence in this context.

### D.    A Sentence of Less than *De Facto* Life Imprisonment Will Adequately and Reasonably Protect the Public from Further Crimes of Mr. Awan

By the time Mr. Awan is released from prison, his potential for recidivism will be substantially reduced.  Defendants over 50 years of age present a dramatically reduced danger of recidivism, rendering §3553(a)(2)(C) – the need to protect the public from any further crimes by the defendant – essentially irrelevant in this case.  *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 ("[r]ecidivism rates decline relatively consistently as age increases," from 35.5% for those under age 21 to 9.5% for those over age 50) (available at http://www.ussc.gov/publicat/Recidivism_General.pdf).  *See also United States v. Lucania*, 379 F. Supp.2d 288, 297 (E.D.N.Y. 2005) ("[p]ost-*Booker* courts have noted that recidivism is markedly lower for older defendants"); *Simon v. United States*, 361 F. Supp.2d at 40.

Mr. Awan does not pose a threat of recidivism.  He has been in federal prison long enough to know that he never wants to be in the position to face another federal charge.  Mr. Awan, who is not a Sikh or a member of any Khalistan-related organization, is not at risk of providing any assistance to the KCF upon being released from federal custody.  Also, as a Canadian citizen facing deportation upon the completion of his federal sentence, there is marginal utility in warehousing Mr. Awan for years and years when, upon deportation, he will not be physically able to commit any crime within the United States.

### E.    Sentences Besides *De Facto* Life Imprisonment are Available

A sentence of 45 years is not mandatory.  Upon taking into account all of the

legally relevant circumstances concerning sentencing, the Court has the authority to give any term of years that satisfies the statutory minimum and maximum sentencing requirements.

**F.      A Sentence of Less Than a *De Facto* Life Imprisonment Will Prevent an Unwarranted Sentence Disparity Between Mr. Awan and Others with Similar Records Who Have Been Found Guilty of Similar Conduct**

Another of the enumerated factors in §3553(a) is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  §3553(a)(6).  Here, the sentenced recommended by the Department of Probation would result in an unwarranted disparity between Mr. Awan's sentence and those of similarly situated defendants.

Although the pool of defendants facing similar charges as Mr. Awan is limited, a sentence of 45 years of imprisonment would result in an unwarranted disparity.  For example, within the last several weeks, an Australian national named David Hicks pleaded guilty to intentionally providing material support to Al Qaeda in the context of an armed conflict against the United States.  According to news reports, Mr. Hicks attended Al Qaeda training camps in Afghanistan and was captured by the Northern Alliance sometime around November or December of 2001 as a combatant against American military forces.  According to prosecutors, Hicks was "an enemy" who was "trying to kill Americans."  *Wash. Post., Editorial, "Spectacle at Guantanamo,"* April 4, 2007 at A12.  After being captured, Hicks subsequently was imprisoned by American forces at Guantanamo Bay, where Hicks remained imprisoned for about five years.  Sometime on or about April 2, 2007, Hicks pleaded guilty before a so-called military commission to the charge of providing material support to Al Qaeda; Hicks was subsequently sentenced

to nine months of imprisonment to be served in Australia.  *Id.; see also Associated Press, "Hicks Feared Guantanamo Interrogation,"* April 2, 2007.

As argued in **IIIB ante**, because Mr. Awan is less culpable than Gurbax Singh and Baljinder Singh, Mr. Awan should receive a less severe sentence than those two high-level KCF members.

Unwarranted disparities are expressly disfavored under §3553(a)(6), and sentencing must consider and avoid such disproportionality.  Indeed, since *Booker*, courts have recognized that §3553(a)(6) provides a valid basis for a non-Guidelines sentence.

For example, in *United States v. Ortiz-Zayas*, 2005 WL 1430489 (S.D.N.Y. June 17, 2005), the Court, noting that under the previous mandatory Guidelines jurisprudence, sentencing disparities could *never* be the basis for a downward departure, pointed out that "[s]ince *Booker*, a growing number of courts have 'held that sentencing judges are no longer prohibited from considering the disparity between codefendants in fashioning a reasonable sentence." 2005 WL 1430489, at *3 (internal quotation marks omitted)*; see also United States v. McGee*, 408 F.3d 966, 988 (7th Cir. 2005); *United States v. Gray*, 362 F. Supp.2d at 719 (sentencing co-defendants to same term of imprisonment despite higher Guidelines range for one because their conduct and criminal history were comparable, one defendant's failure to accept responsibility notwithstanding);  *Simon v. United States*, 361 F. Supp.2d 35, 49 (E.D.N.Y. 2005).

As a result, the Court in *Ortiz-Zayas* reduced a prior sentence of 91 months to 60 months upon re-sentencing in order to eliminate the unwarranted disparity between the defendant and a co-defendant of similar culpability.  2005 WL 1430489, at *3 (defendant's term of imprisonment was "disproportionately long in comparison to that

imposed on" the co-defendant even accounting for the defendant's far more serious criminal history). *See also United States v. Galvez-Barrios*, 355 F. Supp. 2d 958 (E.D. Wisc. 2005) (disparity in illegal reentry cases); *United States v. Huerta-Rodriguez*, 355 F. Supp.2d 1019 (D. Neb. 2005).

In this case, the disparity between Mr. Awan's sentence and those of others similarly situated would be dramatic if the Department of Probation's sentencing recommendation is followed.

Whatever the benefits that accrue to a defendant as a result of pleading guilty, they cannot be responsible for such a vast difference in sentences. Otherwise, the effect is that Mr. Awan is punished – most severely – for exercising his right to trial.

### G.    There is No Need to Order Restitution

Restitution is not applicable in this case as Mr. Awan caused no physical harm or financial damage to anyone.

### H.    The Combination of Grounds Compels a Downward Departure Here, or a Non-Guidelines Sentence for Mr. Awan

Without abandoning the previous objection to a Guidelines sentence in this case, even if any or all of the above-listed grounds for downward departure are insufficient on their own, together they compel downward departure for Mr. Awan, as the combination of individual factors can collectively warrant departure. *See, e.g., In re Sealed Case*, 292 F.3d 913 (D.C. Cir. 2002); *United States v. Sabino*, 274 F.3d 1053 (6th Cir. 2001); *United States v. Coleman*, 188 F.3d 354, 360 (6th Cir. 1999) (*en banc*); *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998); *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996); *United States v. Broderson*, 67 F.3d at 458-59, *citing United States v. Rivera*, 994 F.2d 942 (1st Cir. 1993) (Breyer, J.); *United States v. Cook*, 938 F.2d 149, 153 (9th Cir. 1991).

In fact, the Guidelines themselves contemplate such departures. The Commentary to §5K2.0 instructs that:

> [t]he [Sentencing] Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. . . .

Commentary, §5K2.0, U.S.S.G.

While the Commentary to §5K2.0 adds that "the Commission believes that such cases will be extremely rare[,]" it is respectfully submitted that this constitutes an "extraordinary case" in which, either separately or combined, the above-discussed factors compel a substantial downward departure for Mr. Awan.

The combination of factors is also relevant to the evaluation of the pertinent §3553(a) factors. Even if they do fit within the narrow grounds for departures under the Guidelines, they nevertheless certainly are within the far broader ambit of the factors set forth in §3553(a), and individually and/or collectively warrant a non-Guidelines sentence below the range previously imposed.

## I. Factoring in the Guidelines

As previously raised in the defense's submission concerning the PSR, Mr. Awan objects to the Department of Probation's Guidelines calculation. It is the defense's position that the calculated offence level is 17 and the criminal history category is II. Notwithstanding the dispute concerning the applicable Guideline range, Mr. Awan submits that an appropriate, individualized sentence would fall decades below 45 years of imprisonment.

28

**Conclusion**

Accordingly, for all the reasons set forth above, it is respectfully submitted that

the Court should impose a sentence significantly less than 45 years of imprisonment.

Respectfully Submitted,

_____

SEAN M. MAHER
KHURRUM B. WAHID
*Counsel for the Defendant Khalid Awan*
Wahid, Vizcaino & Maher LLP
122 E. 42nd Street, Ste. 1616
New York, NY 10168
(212) 661-5333
(212) 661-5255 fax