UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

United States of America

                                       CR-06-0154 (CPS)

   - against -                            MEMORANDUM OPINION
                                           AND ORDER

Khalid Awan,

                          Defendant.

----------------------------------------X

SIFTON, Senior Judge.

    After a jury trial, defendant Khalid Awan was found guilty
on December 20, 2006 of (1) one count of conspiring to provide
material support and resources, knowing and intending that such
support would be used in preparation for and in carrying out a
conspiracy to murder, kidnap or maim a person or persons outside
of the United States, in violation of 18 U.S.C. § 2339A and 18
U.S.C. § 956(a); (2) one count of providing material support and
resources, knowing and intending that such support would be used
in preparation for and in carrying out a conspiracy to murder,
kidnap or maim a person or persons outside of the United States,
in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 956(a); and (3)
one count of knowingly and intentionally transporting,
transmitting and transferring monetary instruments and funds from
a place in the United States to a place outside the United
States, with the intention of promoting an offense against
foreign nation, involving murder and destruction of property by
means of explosive or fire in violation of 18 U.S.C. §

1956(a)(2)(A).[1]  This matter is now before the Court to consider

legal and factual objections to the Pre-Sentence Report.  What

follows are the findings of fact and conclusions of law with the

respect to the application of the Sentencing Guidelines.[2]


## Background

The underlying facts of this case have been discussed at

length in this Court's previous decisions and familiarity is

presumed.  Only those facts relevant to defendant's sentencing

are discussed herein.


*Pre-Sentence Report*

The Pre-Sentence Report ("PSR") prepared by the Probation

Department recommends an adjusted offense level of 45 with a

criminal history category of VI.[3]  This Guidelines calculation

---

[1] As discussed in my Memorandum Opinion and Order denying defendant's
Rule 29 and Rule 33 motions, the evidence at trial supported a finding by the
jury that defendant knowingly served as a conduit for funds being transferred
from the United States to Pakistan in support of the Khalistan Commando Force
("KCF"), an separatist movement which seeks to establish an independent Sikh
state in Punjab, India, and that defendant was aware of the KCF's use of
violent means to further their cause.  The evidence also supported the jury's
finding that the defendant attempted to recruit at least one individual to
join the KCF. *See U.S. v. Awan*, 2007 WL 749739 (E.D.N.Y. 2007).

[2] As I discussed at oral argument, this written opinion sets forth the
calculation of the Guidelines range.  Issues related to departures from the
Guidelines and the application of 18 U.S.C. § 3553 to the sentence will be
dealt with at sentencing, scheduled for July 18, 2007, to the extent not
discussed herein.

[3] The PSR applies the terrorism enhancement pursuant to U.S.S.G. § 3A1.4
to calculate the effective Guidelines range, as discussed below.  Without
application of that enhancement, defendant's recommended offense level would
be 33 and his criminal history category would be III.

-3-

calls for a sentence of life imprisonment.  However, since the
statutory maximum for the crimes for which defendant was
convicted is 45 years,[4] the effective Guidelines call for a
sentence of 45 years in prison.

The government has requested the effective Guidelines
sentence.  Defendant objects and argues that the adjusted offense
level should be 17 with a criminal history category of II,
resulting in an effective Guidelines range of 27 to 33 months.[5]


*Terrorism Enhancement*

Section § 3A1.4 states: "(a) If the offense is a felony that
involved, or was intended to promote,[6] a federal crime of
terrorism, increase [the offense level] by 12 levels. (b) In each
such case, the defendant's criminal history category from Chapter
Four (Criminal History and Criminal Livelihood) shall be Category
VI." Thus, under a Guidelines sentence, a defendant convicted of

---

[4] The statutory maximum for the first count is 15 years, for the second
count is 10 years, and for third count is 20 years. *See* 18 U.S.C. §
2339A(a)(2005) (15 years); 18 U.S.C. § 2339A(a)(2001) (10 years); 18 U.S.C. §
1956(a)(2)(A) (20 years).

[5] Defendant's objections are discussed below.

[6] The government argues that enhancement applies to all counts since
defendant was convicted in counts one and two of a crime enumerated in §
2332b(g)(5)(B), namely § 2339A, and in count three of promoting such a crime,
through his violation of § 1956 (which is not itself listed in §
2332b(g)(5)(B)).  However, since § 2332b(g)(5)(B) includes § 2339A in the list
of crimes whose violation may be a 'federal crime of terrorism', there is no
need to determine whether the violation of § 1956 is properly deemed a
*promotion* of a federal crime of terrorism for the purposes of § 3A1.4. *See*
*U.S. v. Graham,* 275 F.3d 490, 517 (6th Cir. 2001) (discussing what constitutes
promotion of a federal crime of terrorism).

a "federal crime of terrorism" is subject to enhancements impacting both his offense levels and his criminal history category.

Application Note 1 for this section states that a "federal crime of terrorism" has the meaning given that term in 18 U.S.C. 2332b(g)(5), which in turn defines a "federal crime of terrorism" as "an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of . . . 2339A (relating to providing material support to terrorists)."

*History of the Terrorism Enhancement*

Guideline Section 3A1.4 took effect in November, 1995, replacing an older policy statement that allowed for upward departure "[i]f the defendant committed the offense in furtherance of a terroristic action." U.S.S.G. § 5K2.15 (deleted effective Nov. 1, 1995).

There is limited legislative or administrative history discussing how and why this sentencing enhancement came into being. The idea of creating a more formal terrorism enhancement to the Guidelines appears to have been initiated in 1991. On March 12, 1991, the Senate introduced S. 635, entitled the Comprehensive Violent Crime Control Act of 1991. Section 738 of

that bill contained the following directions to the Sentencing

Commission:

> The United States Sentencing Commission is directed to
> amend its sentencing guidelines to provide an increase
> of not less than three levels in the base offense level
> for any felony, whether committed within or outside of
> the United States, that involves or is intended to
> promote international terrorism, unless such
> involvement or intent is itself an element or the
> crime.

S. 738, 102d Cong. § 738 (1991); *see U.S. v. Graham,* 275 F.3d

490, 529 (6th Cir. 2001).

That bill did not become law and no further action was taken

on this matter until Congress began consideration of the Violent

Crime Control and Law Enforcement Act of 1994 ("VCCLEA") in late

1993.  In November 1993, Section 120004 was included in the

VCCLEA, which directed the Sentencing Commission to "amend its

sentencing guidelines to provide an appropriate enhancement for

any felony, whether committed within or outside the United

States, that involves or is intended to promote international

terrorism, unless such involvement or intent is itself an element

of the crime."[78] 139 Cong. Rec. S17095-03, S17116 (Nov. 24,

1993); *see Graham,* 275 F.3d at 531.

The VCCLEA was signed into law and, in response, the

Sentencing Commission adopted § 3A1.4, which applied the criminal

history and twelve point offense level enhancements when "the

offense is a felony that involved, or was intended to promote,

international terrorism."[9]  The effective date of this provision

---

[7] The conference report on the terrorism enhancement states:

In carrying out directions from the Congress, the United States
Sentencing Commission shall assure reasonable consistency with
other guidelines, avoid duplicative punishment for substantially
the same offense, and take into account any mitigating
circumstances which might justify exceptions. The Commission shall
also carry out such directions in light of the factors set forth
in subsection 3553(a) of title 18, United States Code.

H.R. Rep. No. 103-711, at 392 (1994) (Conf. Rep.).

[8] Involvement with "international terrorism," or with a "federal crime
of terrorism" for that matter, is not an element of either § 2339A or § 1956,
so this exception does not apply to the present case.

[9] This initial version of § 3A1.4 relied on the definition of
"international terrorism" in 18 U.S.C. § 2331, which defines "international
terrorism" as

activities that--
(A) involve violent acts or acts dangerous to human life that are
a violation of the criminal laws of the United States or of any
State, or that would be a criminal violation if committed within
the jurisdiction of the United States or of any State;
(B) appear to be intended--
(I) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or
coercion; or
(iii) to affect the conduct of a government by mass destruction,
assassination, or kidnapping; and
(c) occur primarily outside the territorial jurisdiction of the
United States, or transcend national boundaries in terms of the
means by which they are accomplished, the persons they appear
intended to intimidate or coerce, or the locale in which their
perpetrators operate or seek asylum;

18 U.S.C. § 2331(1).

was November 1, 1995.[10]

In 1996, in Section 730 of the Antiterrorism and Effective
Death Penalty Act of 1996 ("AEDPA"), Congress instructed the
Sentencing Commission to revise § 3A1.4 so that it "only applies
to federal crimes of terrorism, as defined in § 2332b(g) of Title
18, United States Code."  The Conference Report on this bill
notes that this amendment "will make that new provision
applicable only to those specifically listed federal crimes of
terrorism, upon conviction of those crimes *with the necessary
motivational element to be established at the sentencing phase of
the prosecution*, without having to wait until November 1996 for
the change to become law." 142 Cong. Rec. H3305-01, H3337 (April
15, 1996) (emphasis added).[11]  AEDPA was signed into law in April

---

[10] In *Graham*, the dissent argues that "[t]he Sentencing Commission was
not enthusiastic about the Congressional mandates," noting that in its
analysis of the bill, the Sentencing Commission said

> As a general principle, the Commission has opted for a more
> flexible guideline departure, rather than a fixed guideline
> enhancement where a sentencing factor is atypical or when it may
> arise during the course of a wide range of offenses of varying
> seriousness or in many forms.  In such situations it may be
> difficult to arrive at a fixed formula in calibrating the
> seriousness of the fact with that of the underlying offense,
> although the factor nevertheless may be an important sentencing
> consideration for the court.

275 F.3d at 531 (Senior District Judge Cohn, dissenting) (quoting Analysis Of
The Violent Crime Control And Law Enforcement Act of 1994, Part II, June 8,
1994, p. 13).

[11] In an earlier version of what was to become AEDPA, the House Report
notes that the bill provides a new definition for the term "terrorism" and
explains that one of the reasons for this is because

> [t]he U.S. Sentencing Guidelines, in calculating the appropriate
> sentence to be imposed upon a convicted criminal therefore,
> authorizes the sentencing judge to consider the nature of the

1996 and § 3A1.4 was accordingly amended by the Sentencing Commission, effective November 1, 1996, to apply to a crime which "involved, or was intended to promote, a federal crime of terrorism," defined in Application Note 1 to refer to 18 U.S.C. § 2332b(g).

## Discussion

I. Section 3A1.4 Terrorism Enhancement

*Burden of Proof*

Although the parties have not discussed this issue, the Second Circuit has held that in determining the appropriate Guidelines range at sentencing, a district court is required to find facts using a 'preponderance of the evidence' standard and not a 'clear and convincing' standard. *See U.S. v. Cordoba-Murgas*, 233 F.3d 704, 709 (2d Cir. 2000) (noting that district courts are "required to employ the preponderance of the evidence standard rather than the clear and convincing standard, and that the holding of *U.S. v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990), which "expressed concern that, in some cases, establishing facts pertinent to sentencing but not resulting in conviction by a

_____

offense, and the motivation of the crime.  So, *in order to keep a sentencing judge from assigning a terrorist label to crimes that are truly not terrorist, and to adequately punish the terrorist for his offense,* it is appropriate to define the term.

H.R. Rep. No. 104-383, at 114 (1995) (emphasis added); *see Graham*, 275 F.3d at 534.

preponderance of the evidence can create the potential for
significant unfairness," has not been adopted by this Circuit.);
*U.S. v. Salazar,* 2007 WL 1704095, at *3 (2d Cir. 2007) ("[T]he
district court was required to use the preponderance of the
evidence standard, as it did, in finding facts relevant to
sentencing for Guidelines calculation purposes."); *U.S. v. Salim,*
287 F.Supp.2d 250, 324 (S.D.N.Y. 2003) (In a case applying the
terrorism enchantment, finding that "the Second Circuit's
unequivocal language on the requisite burden of proof leaves this
court no discretion to require the Government to meet a higher
burden than a preponderance of the evidence.").[12]

*Defendant's Constitutional Challenges*

Defendant raises two constitutional challenges to the
application of § 3A1.4 to his case. Defendant first argues that
judicial imposition of the terrorism enhancement will violate his

---

[12] That said, the "factual finding by a preponderance of the evidence
[to determine the Guidelines range] is a preliminary step susceptible to
adjustment." *Cordoba-Murgas*, 233 F.3d at 709; *See U.S. v. Gigante*, 94 F.3d 53,
56 (2d Cir. 1996)("[T]he preponderance standard is no more than a threshold
basis for adjustments and departures, and the weight of the evidence, at some
point along a continuum of sentence severity, should be considered with regard
to both upward adjustments and upward departures. . . . [T]he Court may
examine whether the conduct underlying multiple upward adjustments was proven
by a standard greater than that of preponderance, such as clear and convincing
or even beyond reasonable doubt where appropriate. Where a higher standard,
appropriate to a substantially enhanced sentence range, is not met, the court
should depart downwardly."); *U.S. v. Outen*, 286 F.3d 622, 627 n.1 (2d Cir.
2002) (citing *Gigante* and noting that where multiple adjustments based on
preponderance result in significant upward adjustment, the sentencing judge
should require that the weight of the factual record justify a sentence within
the adjusted Guidelines range) (internal quotations omitted).

right to trial by jury. *See Blakely v. Washington*, 542 U.S. 296

(2004). However, in *U.S. v. Crosby,* 397 F.3d 103, (2d Cir.

2005), the Second Circuit explained that

> though the Court [in *U.S. v. Booker*, 543 U.S. 220
> (2005)] . . . prohibits a sentencing judge from finding
> any facts that enhanced a Guidelines sentence above the
> range that is based solely on facts found by the jury
> in its verdict or admitted by the defendant . . . with
> the mandatory use of the Guidelines excised, the
> traditional authority of a sentencing judge to find all
> facts relevant to sentencing will encounter no Sixth
> Amendment objection. Thus, the sentencing judge will
> be entitled to find all of the facts that the
> Guidelines make relevant to the determination of a
> Guidelines sentence and all of the facts relevant to
> the determination of a non-Guidelines sentence.

*Crosby*, 397 F.3d at 112. Thus, there is no Sixth Amendment issue

with judicial fact-finding of sentencing factors "as long as such

fact-finding does not increase the maximum lawful sentence." *U.S.*

*v. Vondette,* 2007 WL 1120432, at *4 (E.D.N.Y. 2007). In the

present case, I am permitted to find the facts which result in

any sentence up the statutory maximum of 45 years.

The second constitutional challenge raised by the defendant

is that the "double application of the 'terrorism enhancement'

for both offense level and criminal history will violate Mr.

Awan's constitutional right to due process."[13] However, the

Second Circuit in *U.S. v. Meskini*, 319 F.3d 88 (2d Cir. 2003) has

---

[13] Defendant also states that this sentence violates equal protection
and his right to be free from cruel and unusual punishment under the 5th and
8th Amendments. However, he has not submitted analysis, argument or evidence
demonstrating how application of this enhancement is either a violation of
equal protection or cruel and unusual.

already concluded that there is no due process concern with the double enhancement. In *Meskini*, the district court added twelve points to the defendant's offense level and raised his criminal history from I to VI, pursuant to § 3A1.4. Defendant appealed on due process grounds, arguing that the statute constituted an impermissible 'double counting.' The Second Circuit recognized that the double enhancement was clearly called for in § 3A1.4 which "directs courts to increase both the offense level and the criminal history category based on a single crime involving terrorism," and that "'[t]o sustain a federal sentencing statute against a due process . . . challenge, courts need only find that Congress had a rational basis for its choice of penalties.'" *Id.* at 91-92 (quoting *U.S v. Proyect*, 989 F.2d 84, 88 (2d Cir. 1993) (internal quotations omitted)).[14] The Court went on to hold that

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category . . . . Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of

---

[14] Implicit in this decision is a finding that the Sentencing Commission did not exceed its congressional mandate in instituting this double enchantment.

rehabilitation, and the need for incapacitation.

*Id.* at 92. Accordingly, there is no due process concern with
regards to the double enhancement requested by the government.


*Proof of Motivational Element*

As previously noted, and as conceded by the government, a
"federal crime of terrorism" under § 2332b requires both the
commission of one of the enumerated crimes[15] and a finding that
the required motivational element set forth in § 2332b(g)(5)(A)
has been met, namely, that defendant's actions were "calculated
to influence or affect the conduct of government by intimidation
or coercion, or to retaliate against government conduct."[16] *See
Graham,* 275 F.3d at 517 (district court must conclude that the
crimes "satisf[ied] the elements of § 2332b(g)(5)(A), and support
its conclusions by a preponderance of the evidence with facts

_____

[15] As discussed, a violation of § 2339A is one of the enumerated crimes.

[16] Though not discussed by the parties, I note that in *U.S. v. DeAmaris,*
406 F.Supp.2d 748 (S.D.Tex. 2005), the district court concluded that the term
"government" is not limited to the United States government. The court
reviewed other uses of the term government, including its use elsewhere in §
2332b, where the statute specifically modifies the word by referring to the
"United States government." 18 U.S.C. § 2332b(b)(1)(c). The court also noted
that in the legislative history for § 2332(d), which refers to an "offense was
intended to coerce, intimidate, or retaliate against a government or a
civilian population," Congress stated that "[n]either the government nor
civilian population, or segment thereof, has to be that of the United States."
H.R. Rep. No. 99-783, at 88 (1986) (Conf.Rep.). Accordingly, the district
court concluded that Congress was well aware of the distinction between
"United States government" and "government" and that the "government" referred
to in § 3A1.4 includes both foreign governments and the U.S. government. This
finding has been cited with approval in this circuit in *U.S. v. Aref,* 2007 WL
804814, at *2 (N.D.N.Y. 2007) and appears to be the correct reading of the
statute.

from the record."); *U.S. v. Leahy*, 169 F.3d 433, 446 (7th Cir. 1999) (vacating sentence where district court used § 3A1.4 as an analogous sentencing factor for possession of a deadly toxin in violation of 18 U.S.C. § 175(a), because there was "absolutely no evidence in the record that Leahy sought to influence or affect the conduct of the government").[17]

In the present case, the evidence presented at trial and information contained in the PSR do not persuade me that defendant's actions were "calculated to influence or affect the conduct of government."[18]  While the evidence at trial establishes that defendant provided funds to the KCF and that he knew what the KCF was likely to do with those funds, it is speculative to conclude that the defendant had any particular motive in mind and, in particular, that he was motivated by a desire to influence the policies of the Indian government or retaliate for some unspecified wrong.[19]  On the contrary, the evidence supports of a factual finding that the defendant had private purposes in mind, that he enjoyed associating with terrorists such as enjoying the prestige or potential influence

---

[17] Application Note 4 to § 3A1.4 also allows the enhancement to be applied where the conduct was targeted to coerce a civilian population.  The government does not argue that defendant was attempting to coerce a civilian population.

[18] Both sides were offered an opportunity to present additional evidence at a sentencing hearing pursuant to *U.S. v. Fatico*, 579 F.2d 707 (2d Cir. 1978), and declined the opportunity.

[19] Notably, defendant is Muslim, not Sikh.

obtained by associating with Panjwar, a leader of the KCF, and with the Pakistani intelligence services, the so called ISI.[20] Indeed, the government itself has previously referred to this motivation.  When defendant raised the issue of motivation in his Rule 29 motion, the government first argued (correctly) that there was no need to establish motive to establish criminal intent and then further argued that based on defendant's statement that he wanted to associate with "terrorists," "one motive for supporting Panjwar was a desire to associate with people he considered influential and important." Government's Rule 29 Brief, p.34.  Since I cannot find from the evidence before me that defendant was motivated by a desire to influence or retaliate against the Indian government, the motivational element of a "federal crime of terrorism" is not demonstrated by a preponderance of the evidence and the terrorist enhancements will not be applied.[21]

_____

[20] According to John Ross, investigator for the U.S. Attorney's office, defendant said that "he wanted to be close to Mr. Panjwar because he knew Mr. Panjwar was a terrorist." Transcript of Record at 981 (Paramjit Singh Panjwar is the leader of the KCF).  The government has also provided this Court with evidence, not introduced at trial, that the defendant had conversations while in prison about having assisted the 9/11 terrorists and his links to Muslim extremists. *See* GX-3500-JAG-10.  Such evidence indicates an interest in connecting himself with terrorists but fails to establish any political motivation and, in particular, any motivation having to do with India.

[21] The only evidence presented by the government in support of a finding of the required purpose of defendant's actions are my own statements in the Memorandum Opinion and Order denying defendant's Rule 29 and Rule 33 motions. *Awan*, 2007 WL 749739.  However, those statements do not represent a prior finding that the motivational element has been met.
In that Opinion, I stated that, although a finding of motivation was not necessary, it was "a fair inference that defendant . . . sought an association with terrorists in order to pursue his own political objectives" regarding the

II.  Other Grounds for Departure

*1) Criminal History*

Excluding the terrorism enhancement, the PSR calculates a criminal history category of III[22] based on three criminal history points for defendant's earlier offense and two criminal history points for the commission of the instant offense, specifically the 2003 recruiting of Harjit Singh to fight for the KCF, while under "a criminal justice sentence." U.S.S.G. § 4A1.1(d).  Defendant objects to the addition of the latter two criminal history points[23] and contends (1) that since Count Two charged the defendant with providing both money (prior to his incarceration) and personnel (during his incarceration), the jury's finding of guilt does not demonstrate that the jury found the defendant guilty of recruiting Harjit Singh and (2) that there was no credible evidence at trial that defendant committed any of the charged offenses while in custody for the prior

_____

Indian government. *Id.* at *4 n.7.  However, an "inference" is not a finding of fact and the government has not presented any evidence which would lead to such a factual finding. Indeed, there is nothing in the record establishing what defendant's particular political objective might be.
    I also stated that the evidence was sufficient to support a finding that defendant "knowingly joined in a conspiracy to support the KCF with the intent of furthering its attempts to murder, maim or kidnap individuals in India in furtherance of its political objectives." *Id.* at *4. However, it is inaccurate to state that I found in fact that defendant acted with the intent to further the KCF's political objectives.

    [22] Under the Guidelines, two or three criminal history points translate to a criminal history category of II and four, five or six criminal history points translate to a criminal history category of III.

    [23] In March 2003, defendant pled guilty to one count of conspiracy to commit credit card fraud, in violation of 18 U.S.C. § 1029.

offense.

However, while it is true that one cannot be certain what the jury found, as described above judicial fact-finding of sentencing factors is permissible so long as the sentence does not exceed the statutory maximum. In the present case, the evidence introduced at trial, specifically Harjit Singh's testimony, demonstrates that defendant did indeed attempt to recruit Harjit Singh, in violation of § 2339A, beginning in or around June 2003 while defendant was incarcerated after a plea of guilty to credit card fraud. Accordingly, two additional criminal history points should be applied pursuant to § 4A1.1(d), resulting in a criminal history category of III.

*2) Offense Level*

Excluding the terrorism enhancement, the PSR calculates an offense level of 33. The Guideline for a violation of § 2339A[24] is § 2X2.1 (aiding and abetting),[25] which applies an offense level equal to the offense level for the underlying offense which the defendant materially supported. The underlying offense in

_____

[24] Since, under the analysis that follows, adjusted offense level for defendant's violation of § 2339A is greater than the adjusted offense level for defendant's violation of § 1956 recommended by the PSR and only the greater offense level is applied, there is no need to evaluate the PSR's calculation of the offense levels under § 1956.

[25] Even though § 2X2.1 did not reference § 2339A until a 2002 amendment and the substantive § 2339A offense charged in Count Two ended during 2001, the § 2339A conspiracy alleged in Count One continued into 2003, as discussed above, and so § 2X2.1 applies.

this count is 18 U.S.C. § 956(a), which makes it a crime to

"conspire[] . . . to commit at any place outside the United

States an act that would constitute the offense of murder,

kidnapping, or maiming if committed in the special maritime and

territorial jurisdiction of the United States," and since the

Guideline for a conspiracy to murder provides for a base offense

level of 33 and since there were no other adjustments applicable

to defendant,[26] the recommended adjusted offense level in the PSR

is 33. *See* U.S.S.G. § 2A1.5 (conspiracy to murder).  Defendant

objects to this calculation and argues that since the jury did

not specifically find the goal of the conspiracy, whether it was

to murder, kidnap or maim, I should apply the rule of lenity and

punish according to the least severe underlying crime, namely a

conspiracy to maim, which, according to defendant, provides for a

base offense level of fourteen and a specific offense

characteristic adjustment of three. *See* U.S.S.G. § 2A2.2

(aggravated assault).[27]

However, the evidence introduced at trial demonstrates that

there not only existed a conspiracy but that the object of the

---

[26] Defendant does not argue that other adjustments should apply.

[27] Defendant argues that since there is no express Guidelines for
conspiracy to maim, the Guideline for aggravated assault should apply,
pursuant to U.S.S.G. § 2X5.1, which applies the most analogous Guideline in
such a situation.  Since I find that the Guideline for conspiracy to murder
applies, I need not determine whether aggravated assault is the most analogous
Guideline to conspiracy to maim.

conspiracy was to murder people in India.[28]  Iqbal Singh, an

Indian police detective who was admitted as an expert witness,

testified that the KCF had engaged in deadly attacks, primarily

through the use of bombs, against civilians and government

authorities from its inception until, most recently, 2006.

Transcript of Record at 345-55.  Gurbax Singh testified that he

was collecting money in the United States, which defendant

transmitted to the KCF, for "bomb blasts" in India. Transcript of

Record at 198, 208, 212-17.  Harjit Singh testified that the

defendant told him that Paramjit Singh Panjwar, the leader of the

KCF, had been involved in various murderous attacks and that if

Harjit joined the KCF he would be taught how to make a "bomb

blast."  Transcript of Record at 675-80, 683, 723, 736, 751-58,

767-68.  John Ross, a government investigator, testified that

defendant told him that the Panjwar had been involved in killing

people in India and that the money defendant sent was to be used

for "shooting and killing of innocent people in India."

Transcript of Record at 896-899, 901-02, 914.  The sum of this

testimony establishes that the conspiracy supported by the

defendant through his financial support and recruiting of Harjit

Singh had as its aim the murder of Indian citizens.  Accordingly,

---

[28] Section 1111 of Title 18 of the United States Code defines the phrase "murder within the special territorial jurisdiction of the United States" as "the unlawful killing of a human being with malice aforethought."

U.S.S.G. § 2A1.5 applies.[29]


3) *Concurrent Terms*

When a defendant is "already subject to an undischarged term

of imprisonment" a district court has discretion to impose a

sentence which runs concurrently to the undischarged term "to

achieve a reasonable punishment for the instant offense."

U.S.S.G. § 5G1.3(c); *See* 18 U.S.C. § 3584(a) ("if a term of

imprisonment is imposed on a defendant who is already subject to

an undischarged term of imprisonment, the terms may run

concurrently or consecutively"); 18 U.S.C. § 3584(b) (to

determine whether to impose a concurrent sentence, the court

"shall consider, as to each offense for which a term of

---

[29] Though the parties do not discuss the issue, I note that U.S.S.G. §
2A1.5 was revised, effective November 1, 2004, to change the offense level
from 28 to 33. However, since there is evidence that acts performed in
furtherance of the conspiracy occurred after that date, there is no *ex-post
facto* issue in applying an offense level of 33. *See U.S. v. Gonzalez,* 281 F.3d
38 (2d Cir. 2002) (finding that there may be an ex-post facto problem when
"the version of the Guidelines in effect at the time of sentencing is more
severe, than the version in effect when the offense was committed . . . or
more onerous.") (internal citations and quotations omitted); *U.S. v. Samet,*
200 Fed.Appx. 15, 23 (2d Cir. 2006) (where offense began before amendment to
Guidelines and continued after amendment of Guidelines, amended Guidelines
apply); *U.S. v. Gigante,* 39 F.3d 42, 50 (2d Cir. 1994) (overturned on other
grounds). The final recorded conversation between Harjit Singh and defendant
took place on November 6, 2004. That discussion was arranged by government
agents to obtain information about defendant's financial support of the KCF;
Harjit was instructed to tell defendant that he knew someone in a bank who
could send money to Pakistan. The conversation began with Harjit suggesting
that they call Panjwar to let him know that Harjit was to be released soon and
to give him Harjit's phone number. When Harjit suggested that, to avoid
raising suspicions, defendant call Panjwar first and then Harjit would call
him later, defendant responded "No, no, I will talk and leave" and then later
said "We can always make one or two calls." GX 107 at 2-3. This is evidence
of defendant's continuing participation after November 1, 2004 in the
conspiracy to provide material support, namely personnel, to the KCF.

imprisonment is being imposed, the factors set forth in section 3553(a)."); *U.S. v. Matera,* 2007 WL 1546018, at *7 (2d Cir. 2007). Further, when a sentencing court is deprived of the opportunity to impose a concurrent sentence due to the unreasonable delay of the prosecution in bringing the charge which results in a "missed opportunity for concurrent sentencing," the court may depart pursuant to U.S.S.G. § 5K2.0 to account for the concurrent sentence it would have imposed has the case been brought with appropriate expediency. *U.S. v. Los Santos,* 283 F.3d 422, 428 (2d Cir. 2002) (noting that such a "delay takes the case out of the heartland," but declining "to establish a bright line rule by speculating on how much longer [than four months] the government could have waited before the delay would have been out of the realm of reasonableness.").

In the present case, to achieve a "reasonable punishment" for the instant offense, and in particular to "reflect the seriousness of the offense . . . and to provide just punishment for the offense," pursuant to § 3553(a)(2)(A), I, had I been given the opportunity, would have ordered defendant's sentence for the instant offense to run concurrently with the time remaining on his 2001 offense. However, given the circumstances of the government's investigation, I cannot say that the government failed to act with reasonably speed in preparing the case and bringing it to trial.

The government first learned of defendant's affiliations with the KCF and his attempts to recruit Harjit Singh from Harjit in July 2003.  The government then proceeded to record phone calls between defendant and Panjwar and to record conversations between defendant and Harjit for several months, and in those calls and conversations, the defendant revealed significant information related to his activities and his relationship with the KCF.  The final recorded conversation with Harjit Singh took place on November 6, 2004.  In January 2005, defendant was transferred to the Federal Correctional Facility in Allenwood, Pennsylvania.  While at Allenwood, the government continued to monitor defendant's calls to try and gain further evidence regarding his financing of Sikh separatists, though no such information was obtained.[30]  At a certain point, the government determined that there was nothing more to be learned from recording calls made by defendant and, in October 2005, the government began interviewing witnesses.[31]  Defendant was indicted about six months later, in March 2006.

While the government was in the process of secretly monitoring defendant's calls, a reasonable and logical

_____

[30] The government was also investigating whether defendant had connections to Islamic extremists, based on conversations defendant had with another inmate at Allenwood.

[31] The exact date when the government determined that recording the calls would not provide any more useful information is not known but it appears that the decision was made shortly before the date government investigators interviewed Iftikhar Mian in October, 2004.

investigative technique given what defendant had revealed in his
conversations with Panjwar, it could not have begun interviewing
witnesses without jeopardizing the possibility of obtaining
information from defendant's calls, as there was no assurance
that the witnesses would not alert the defendant that an
investigation had begun.[32]  Once the government decided it should
move on to interviewing witnesses, it completed the process of
collecting information, preparing the indictment and presenting
it to the Grand Jury in relatively short order.[33]  As a result,
it appears that the process engaged in by the government was not
"longer than a reasonable amount of time for the government to
have diligently investigated the crime." *Los Santos,* 283 F.3d 422
at 428.  Accordingly, I do not propose to depart pursuant to §
5K2.0.

---

[32] While defendant was at Allenwood the government also began
investigating, in February 2005, whether defendant had connections to Islamic
extremists after another inmate informed the government of comments made by
defendant to that effect. In furtherance of that investigation, the government
recorded conversations between defendant and a cooperating inmate on several
occasions, the last of which took place on August 11, 2005.  Though no charges
were filed relating to that investigation, had defendant been made aware of
the government's investigative efforts, it would have undermined that
investigation as well as the investigation which led to the present charges.

[33] In fact, one of the government's fact witnesses, Baljinder Singh, was
not interviewed until after the indictment, demonstrating that the government
did not wait until each and every piece of evidence was in place before
indicting the defendant, perhaps motivated by a desire to indict the defendant
before he was released from prison for the earlier charge.

## Conclusion

For the reasons set forth above, defendant's applicable adjusted offense level under the Guidelines is 33 and his criminal history category is II, leading to Guidelines range of 168 to 210 months in prison.  The Clerk is directed to transmit a copy of the within to all parties.


SO ORDERED.

Dated : Brooklyn, New York
July 17, 2007

By: <u>/s/ Charles P. Sifton (electronically signed)</u>
United States District Judge