IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA   |              06 Cr. 154 (ARR)

|

|

v.                                          |         The Hon. Allyne R. Ross

|

KHALID AWAN,           |

|

Defendant.    |

_____

**DEFENDANT'S SENTENCING MEMORANDUM**

The defense respectfully submits this sentencing memorandum to request that the Court

impose a reasonable sentence sufficient but not greater than necessary to fulfill the purposes of

sentencing.[1] Considering the factors outlined in 18 U.S.C. § 3553 and the findings of the

original sentencing judge, it is respectfully requested that the Court impose a sentence no greater

than 168 months in prison.

**Introduction**

Defendant Khalid Awan is a Canadian Muslim of Pakistani descent who stands before

the Court for resentencing. Beloved by his family for his kindness, Mr. Awan has spent over a

decade in federal custody. The issue squarely before the Court is how many more years of

imprisonment will serve the goals of sentencing for this man who never participated in or

---

[1] Mr. Awan hereby incorporates by reference all prior sentencing submissions and arguments, including but not limited to, the following: Docket 161, Objections to Presentence Investigation Report (March 30, 2007); Docket 162, Sentencing Memorandum (May 18, 2007); Docket 180, Sentencing Memorandum (June 6, 2007); Dockets 184-186, Exhibits (June 7, 2007); Docket 193, Letter regarding United States v. Rita (June 30, 2007); Docket 207, Response to Government Motion (September 10, 2007); and Docket 209, Transcript of Sentencing Hearing (September 12, 2007).

planned any act of violence and who has no political or religious adherence to the organization to which he has been convicted of providing material support.

## Procedural History

On March 8, 2006 a federal grand jury indicted Mr. Awan on charges related to facilitating the transfer of funds and attempting to recruit a person on behalf of the Khalistan Commando Force, an organization founded in 1986 for the purpose of establishing an independent Sikh state in the Punjab region in India.  After a jury trial, Mr. Awan was found guilty on December 20, 2006 of (1) one count of conspiring to provide material support and resources, knowing and intending that such support would be used in preparation for and in carrying out a conspiracy to murder, kidnap or maim a person or persons outside of the United States, in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 956(a); (2) one count of providing material support and resources, knowing and intending that such support would be used in preparation for and in carrying out a conspiracy to murder, kidnap or maim a person or persons outside of the United States, in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 956(a); and (3) one count of knowingly and intentionally transporting, transmitting and transferring monetary instruments and funds from a place in the United States to a place outside the United States, with the intention of promoting an offense against foreign nation, involving murder and destruction of property by means of explosive or fire in violation of 18 U.S.C. § 1956(a)(2)(A).[2]

At sentencing, Judge Sifton declined to apply the U.S.S.G. § 3A1.4 ("§ 3A1.4") upward adjustment and imposed a sentence that fell within what the Court found to be the applicable

---

[2] A summary of the testimony is set forth in Mr. Awan's Rule 33 motion, which is hereby incorporated by reference.  See Dockets 149 & 150 (January 31, 2007).

sentencing Guidelines, namely concurrent terms of imprisonment of 168 months on Counts 1 and 3, 120 months on Count 2, and 3 years of supervised release.

Mr. Awan appealed his conviction and the government filed a cross-appeal concerning sentencing, arguing that the district court improperly failed to apply the § 3A1.4 sentencing adjustment. The Second Circuit affirmed Mr. Awan's convictions but remanded for resentencing, finding that the district court committed legal error by failing to consider the application of the "intended to promote" prong of § 3A1.4 and by misconstruing the "involved" prong. The Second Circuit denied a petition for panel rehearing and for rehearing *en banc*. Mr. Awan filed a timely petition for a writ of certiorari, however the Supreme Court declined to issue the writ.

The matter is now before the Court for resentencing.

**Analysis**

**I.      Sentencing Post-*Booker***

Under Booker and its progeny, including United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) and United States v. Cavera, 550 F.3d 180, 187 (2d Cir. 2008) (en banc), the Sentencing Guidelines, while no longer mandatory, are advisory and should be "taken into account" in determining the appropriate sentence under 18 U.S.C. § 3553(a). Booker, 543 U.S. at 264; see also Cavera, 550 F.3d at 189 ("The Guidelines provide the 'starting point and the initial benchmark' for sentencing, and district courts must 'remain cognizant of them throughout the sentencing process'")(quoting Gall v. United States, 128 S. Ct. 586, 596 & n.6 (2007)).

The Second Circuit has emphasized that "a district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at

3

189.  When considering whether to impose a sentence outside of the recommended Guidelines range, a district court "'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance,'" Cavera, 550 F.3d at 189 (quoting Gall, 128 S. Ct. at 597), in order to reach "an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing." Id. (quoting 18 U.S.C. § 3553(a)).

In determining an appropriate sentence, a district court must adhere to § 3553(a), which directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  Such a sentence must be fashioned:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

See 18 U.S.C. §3553(a)(2).

In the final analysis, the district court must consider all the factors outlined 18 § 3553(a):

> • the nature and circumstances of the offense and the history and characteristics of the defendant;
> • the four legitimate purposes of sentencing;
> • the kinds of sentences available;
> • the Guidelines range itself;
> • any relevant policy statement by the Sentencing Commission;
> • the need to avoid unwarranted sentence disparities among defendants; and
> • the need to provide restitution to any victims.

## II.   Calculating the Sentencing Guidelines

Mr. Awan previously argued that the Guidelines calculation should result in an adjusted base level offense of 17 and a criminal history category of II, culminating in an effective Guidelines range of 27 to 33 months in prison.  Those previous arguments are renewed and incorporated by reference.  The district court disagreed with the defense and calculated that Mr. Awan's applicable Guidelines range was 168 to 210 months in prison based upon an adjusted offense level of 33 and a criminal history category of III.  Dockets 203 & 204, Memorandum Opinion and Order (July 17, 2007); 2007 WL 2071748 at *7 (E.D.N.Y.).

The government appealed the district court's decision not to apply the § 3A1.4 upward adjustment.  The Second Circuit held that the district court committed procedural error by (1) erroneously concluding that the 'intended to promote' prong was inapplicable if one of the crimes of conviction was a crime listed in 18 U.S.C. § 2332b(g)(5)(B) and (2) erroneously concluding that the statutory definition of a 'federal crime of terrorism,' 18 U.S.C. § 2332b(g)(5), which is incorporated into the Guideline, requires the government to prove the defendant's motive for committing the crime of conviction." United States v. Awan, 607 F.3d 306, 313 (2d Cir. 2010).  The Second Circuit thus found that "a defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.,* the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime." Id. at 313-314.

The matter is now before the Court to re-examine the applicability of § 3A1.4 and to resentence Mr. Awan to a reasonable sentence that fulfills the objectives of sentencing.

### A.   The Terrorism Sentencing Enhancement - § 3A1.4

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, prohibits a person from providing or conspiring to provide material support or resources, knowing and intending that such support will be used in preparation for and in carrying out a conspiracy to murder, kidnap or maim a person or persons outside of the United States.  18 U.S.C. § 2339A; 18 U.S.C. § 956(a).

As originally enacted, AEDPA provided a punishment of up to 10 years imprisonment for violations of 18 U.S.C. § 2339A and authorized the U.S. Sentencing Commission to formulate guidelines for sentencing.  In 2001, Congress amended AEDPA to provide up to 15 years imprisonment for violations of 18 U.S.C. § 2339A.  Pub. L. 107-56, § 810(c).

Section 730 of AEDPA directed the Sentencing Commission to promulgate a terrorism sentencing adjustment for federal crimes of terrorism.  Accordingly, U.S.S.G. § 3A1.4 states as follows:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b) In each case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Application Note 1 to § 3A1.4 states that a "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5), which in turn defines a "federal crime of terrorism" as "an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of [the enumerated statutes]."  Among the enumerated statutes are 18 U.S.C. § 2339A (providing material support to terrorists) and 18 U.S.C. § 956(a) (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country).

### B.     The "Intended to Promote" Prong of § 3A1.4

### 1.     The Legal Standard

The "intended to promote" prong "applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." Awan, 607 F.3d at 314.  "To qualify as a federal crime of terrorism that may serve as a predicate for a § 3A1.4 enhancement, an offense must be listed in 18 U.S.C. § 2332b(g)(5)(B) and, in addition, it must be an 'offense that . . . is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' as provided by 18 U.S.C. § 2332b(g)(5)(A)."  Id.  "Under the 'intended to promote' prong, however, so long as the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined, the defendant himself does not have to commit an offense listed in § 2332b(g)(5)(B), and the defendant's offense need not itself be 'calculated' as described in § 2332b(g)(5)(A)."  Id. (citations omitted).

The Second Circuit went on to note that "the government should have been permitted to prove by a preponderance of the evidence that, even if Awan's crimes of conviction and relevant conduct did not satisfy the calculation requirement for a federal crime of terrorism, Awan's crimes and relevant conduct were intended to promote a federal crime of terrorism committed or to be committed by other individuals - in his case, KCF members who participated in fundraising in the United States or attacks in India." Id. at 315.  The Second Circuit reiterated the factual arguments raised by the government at sentencing[3] and explicitly stated that "we express no

---

[3] The government's arguments were "(1) that each of Awan's counts of conviction was intended to promote a conspiracy to commit murder, kidnaping, or maiming outside the United States in violation of 18 U.S.C. § 956(a), a federal crime of terrorism, and (2) that Awan's international

views on the merits" of the government's factual contentions.  Id.  Summarizing the standard for

applying § 3A1.4, the Second Circuit stated the following:

> [T]he application of § 3A1.4 . . . does not require a finding that Awan was
> personally motivated by a desire to influence or affect the conduct of
> government. Rather, the government need only demonstrate that Awan
> intended to promote a crime calculated to have such an effect, *i.e.,* that his
> offenses were intended to promote a federal crime of terrorism as defined
> in § 2332b(g)(5), whatever Awan's reason for committing them.

Id. at 315-316 (internal citation omitted).

The Second Circuit remanded for this Court to determine whether the "intended to

promote" prong has been proven by the government.

### 2.  Application

The government has failed to prove by a preponderance of evidence that the "intended to

promote" prong is applicable to Mr. Awan.  While there was testimony at trial that the KCF had

been involved in past acts of violence, there was no credible evidence that the KCF was involved

in any specific acts of murder, kidnapping, maiming, or terroristic activities intended to influence

or affect the conduct of the Indian government by intimidation or coercion, or to retaliate against

government conduct at the time Mr. Awan was charged with conspiring and providing material

support to the KCF.  Thus, Mr. Awan could not have promoted crimes of federal terrorism that

did not exist and that were not being planned by the KCF.

There was no evidence that Mr. Awan intended to promote a crime of federal terrorism.

Gurbax Singh ("Gurbax") and Baljinder Singh ("Baljinder") never testified at trial that they ever

discussed any act of violence with Mr. Awan.  See, e.g, TT 215-217; 480-482 ("TT" denotes

---

money transfer conviction was also intended to promote another federal crime of terrorism, to
wit, the provision of material support and resources to be used in a conspiracy to commit murder,
kidnaping, or maiming outside the United States as prohibited by 18 U.S.C. § 956(a), in violation
of 18 U.S.C. § 2339A." Awan, 607 F.3d at 315.

Trial Transcript).  In fact, Gurbax Singh told Mr. Awan at a later date that the money had been used for a radio station.  TT 263.  As confirmed by Gurbax Singh and Baljinder Singh, the KCF routinely deceived funders by telling the funders that donated money would be used for religious and cultural endeavors, not fighting or other acts of violence.  TT 210-211; 245-248; 460-461. At most, the evidence at trial demonstrated that Mr. Awan accepted a modest amount of money to relay to a personal friend for legitimate purposes.

Mr. Awan's interactions with Harjit Singh did not amount to an effort to recruit him to commit crimes of federal terrorism on behalf of the KCF against the Indian government.  The tape recorded interactions signified nothing more than bluster and puffery by Mr. Awan, a middle-aged foreigner in an American jail trying to avoid being preyed upon by other inmates.

In addition, there was no forensic evidence to show that Mr. Awan himself ever transferred any funds to KCF or tried to assist in any act of violence.

Because the government did not prove beyond a preponderance of evidence that the KCF was actively involved in or planning any crimes of federal terrorism as defined 18 U.S.C. § 2332b(g)(5)(A) during the time frame of the charged conspiracy or that Mr. Awan knew that the funds specifically were for a crime of federal terrorism, the Court should find the "intended to promote" prong inapplicable to all counts.

### C.    The "Involved" Prong of § 3A1.4

Under the "involved" prong of § 3A1.4, the government must prove by a preponderance of the evidence that Mr. Awan's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" under 18 U.S.C. § 2332b(g)(5)(A).  Awan, 607 F.3d at 316.  According to the Second Circuit,

> whatever Awan's motive might have been in committing the crimes for
> which he was convicted, commission of crimes listed in § 2332b(g)(5)(B)

satisfies the "involved" prong of the terrorism enhancement so long as the government shows by a preponderance of the evidence that Awan had the "specific intent," Stewart, 590 F.3d at 138, to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Contrary to the district court's analysis, Awan's motive is simply not relevant. See, e.g., United States v. Simon, 425 F.2d 796, 808-09 (2d Cir.1969) (Friendly, J.) (noting the distinction between the concepts of motive and criminal intent, and concluding that even if no motive were shown at all the government could still prove the requisite intent).

Id. at 317.

Even though the Second Circuit intimated that "there is little doubt that Awan (1) knew that the objective of Panjwar and the KCF was to influence the Indian government through violence, and (2) knew that the money he provided to the KCF would be used toward that end," the government still must prove by a preponderance of evidence "that Awan's offenses themselves were 'calculated to influence . . . the conduct of government . . .' even if he lacked a specific political motive for committing them." Id. Providing examples of behavior that could rise to such a level of calculation, the Second Circuit noted the following:

> [I]f the evidence showed that Awan engaged in criminal conduct with knowledge that confederates solicited his actions to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object. A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics. We express no view on whether the evidence here supports this argument.

Id. at 317-318.

The Second Circuit remanded for this Court to determine whether the government has proven by a preponderance of evidence that the "involved" prong is applicable to Mr. Awan.

10

**2.    Application**

All of the arguments concerning the inapplicability of "intended to promote" are reasserted in relation to the "involved" prong.

In addition, the government failed to prove by a preponderance of evidence that Mr. Awan had the specific intent to commit a crime of federal terrorism as defined by 18 U.S.C. § 2332b(g)(5)(A).  Mr. Awan had no knowledge that any KCF member or supporter was planning a politically-motived bombing in India or homicidal attacks in India against Indian security or police forces.  The record is devoid of any credible evidence that Mr. Awan knew about any plan to commit a politically-motivated crime of violence against the Indian government.  Mr. Awan had no affiliation with the KCF and was not a part of any of its decision-making structures.

Because the government has failed to meet its burden, the Court should find the "involved" prong inapplicable.

**D.    A Downward Departure or Variance is Warranted if § 3A1.4 is Applied**

If the Court does find § 3A1.4 applicable, the Court should grant a U.S.S.G. § 4A1.3(b)(1) downward departure or variance pursuant to § 3553(a).  A § 4A1.3(b)(1) downward departure is warranted if "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes . . . ."  U.S.S.G. § 4A1.3(b)(1).

In United States v. Benkahla, 501 F. Supp.2d 748 (E.D. Va. 2007), the district court imposed the terrorism enhancement based upon the defendant's obstruction of an investigation of a federal crime of terrorism.  The district court then found that a § 4A1.3 downward departure or variance under § 3553(a) was warranted.  As described by the Fourth Circuit:

11

> Benkahla's Guidelines range was thus 210 to 262 months. But the court thought the case called for a downward departure under § 4A1.3 or (in the alternative) a variance under 18 U.S.C. § 3553(a). "Sabri Benkahla is not a terrorist," the court stated. Benkahla, 501 F. Supp.2d at 759. He "has not committed any other criminal acts" and his likelihood of doing so upon release is "infinitesimal." Id. Also, Benkahla's former co-defendants, the other ten members of the Dar al-Arqam paintball group, had received lesser sentences for what were more dangerous and more violent offenses, a disparity the court found "staggering." Id. at 762. The court thus treated Benkahla as having a Category I criminal history and sentenced him to 121 months.

United States v. Benkahla, 530 F.3d 300, 305-306 (4th Cir. 2008).

At the prior sentencing hearing, Judge Sifton carefully considered the propriety of a prolonged sentence as recommended by the Probation Department. Judge Sifton specifically stated that "protection and deterrence remain a serious factor here but not to the extent of warranting the kind of lifetime or close to a lifetime sentence that would result from an adjustment of the sort initially recommended by the Probation Department." T 21-21 (Sentencing Hearing, September 12, 2007).

In sum, the Court should find that the government has failed to prove by a preponderance of evidence that the § 3A1.4 enhancement is applicable under the "intended to promote" prong or under the "involved" prong. If the Court does find § 3A1.4 applicable, then the Court should grant Mr. Awan a substantial downward departure or variance under § 4A1.3 or § 3553(a) as set forth more fully below.

## III.    Applying the § 3553(a) Factors

Taking into account all of the factors set forth in § 3553(a), it is respectfully submitted that a sentence of no greater than 168 months would constitute not only a sentence "sufficient but

12

not greater than necessary" to achieve the objectives of sentencing, but also a "reasonable" sentence under post-Booker sentencing jurisprudence.

Mr. Awan has raised specific § 3553(a) arguments and continues to rely upon them. See infra n.1. In addition to those arguments, which Mr. Awan urges the Court to consider, there are other considerations since that last sentencing proceeding that the Court should weigh in Mr. Awan's favor in fashioning a sentence sufficient by not greater than necessary to achieve the goals of sentencing.

### A.      Mr. Awan's Kind Character and Family Support

At the time of Mr. Awan's sentencing, several family members wrote letters to the Court explaining how loved Mr. Awan is within his family and the special role he has played in caring for and nurturing members of his family, particularly after the death of his parents. Those letters were written even though Mr. Awan had already been in federal custody for close to six years. Now, after more than eleven years of federal incarceration, Mr. Awan still retains remarkably close bonds with his family, including his sisters, in-laws, nieces, and nephews. Mr. Awan's sister Ghazala Azmat writes the following:[4]

> Being the eldest among my sisters, and a year younger than Khalid, I have naturally been very close to him throughout my life. As he is my only brother, I hope you understand the close bond we have had, throughout the years. . . .
>
> I would say I have never seen a simpler, more genuine man. . . .
>
> And, even know though we can only communicate through rare emails now, he is always there in times of need with a comforting advice, and a soothing word when there is nothing serene about his life. . . .
>
> Our family has always had only one male in each generation, since my grandfather, after him my father was the only son and then my brother.

---

[4] The original spelling and grammar has been left intact in all of the quoted letters.

Naturally like all things, rare, Khalid has been very precious not just to us, but to his parents as well.

Being close to parents who took good care of him, it was a traumatic experience for him when our father passed away and he was still a teen. Burdened with responsibilities, grief and then the deep settled hurt of having a mother suffering from paralysis, Khalid has spent more than half his life now, in pain.

I beg you to show mercy to him, because he stands in your court now with all his faith and hope, and all his pain and sufferings waiting for a release. . . .

Please send him back to us, it has been too long, and I want to see my brother, build what's left of his life, before I die.

I would also like to add, it is after his imprisonment that I have become a diabetic and suffer with intense peripheral neuropathy.

It is indeed one man who has been imprisoned but me, his other sisters, our husbands, cousins, and our children are all imprisoned and tortured in their own ways. . . .

Please be kind towards Khalid Awan, and be gentle towards him. . . .

Letter of Ghazala Azmat, attached as Exhibit 1A.

Mr. Awan's sister Shamaila Qayyum Awan echoes Ghazala's sentiments:

Mr. Awan is not only my elder brother but he is like a father to me. I was very little when my parents passed away. My elder brother is the only reason that we sisters have survived in this world. He has a very kind heart and too much respect for humanity. He gave me the love of both mother and father. He raised me, provided me bread and butter, provided education to me. He took care of me in good and bad. Basically, whatever I am today, is because of him.

I live in Montreal, Canada with my loving husband and three children. I and my children love Mr. Awan beyond imagination. As I mentioned earlier, he is not only my elder brother but a father, mother and everything for me. Same love has been transferred to my children and they miss him too much. Every time we talk to my brother over the phone, it becomes very sad and disappointing for all of us. We all are very disturbed and

14

> emotionally upset due to current situation. This is effecting my children as well.
>
> I, therefore, kindly request your honorable court to please have mercy on brother. . . .

Letter of Shamaila Qayyum Awan, attached as Exhibit 1B.

Mr. Awan's sister Raheela Arshad Malik confirms that Mr. Awan is a beloved brother and caretaker within the family:

> I was very little when our parents passed away. My brother is the one who raised us sisters. He provided everything for us that we needed to live. He is like a father to me rather than a brother. He is our life. My children love him too much as well. . . .  Basically our family and life is incomplete without him.

Letter of Raheela Arshad Malik, attached as Exhibit 1C.

Other members of Mr. Awan's family have submitted letters for the Court's consideration.  See Exhibits 1D-H.

The letters submitted on Mr. Awan's behalf demonstrate that Mr. Awan has remained in the hearts of his family members and continues to provide love and support for them even though he is behind prison walls hundreds and thousands of miles away.

### B.    Rehabilitation Progress

Since being sentenced in September of 2007, Mr. Awan has displayed exemplary behavior while in prison.  While enduring the harsh conditions of confinement in the CMUs of federal prisons in Terre Haute, Indiana and Marion, Illinois, Mr. Awan has made the effort to better himself by attending and completing 19 educational courses in a wide-range of subjects:

- Europe and Western Civilization in the Modern Age Part 2
- Tools of Thinking
- Origins of Great Ancient Civilizations
- Story of Language I
- Story of Language II

- Algebra I
- No Excuses: Existentialism and the Meaning of Life
- Algebra I, Part 2
- History of Language Part 3
- Drawing
- Crochet
- Painting
- Yoga
- Advanced Yoga
- Crochet
- Card Making
- Beginner's Investment Marketing
- Native American History
- Advanced Investment Marketing

See Exhibits 2A-S (Certificates of Completion and Achievement).  Mr. Awan has exhibited

model behavior in prison, a factor that the Court should consider in weighing how much

incarceration is necessary for this 50 year-old man who has already been in prison continuously

since 2001.

### C.    Health Issues

Mr. Awan continues to suffer from various medical ailments that limit his quality of life.

Mr. Awan suffers from depression and anxiety, high blood pressure, and has chronic pain from

bursitis in his shoulder.  Mr. Awan takes medicine daily, including fluoxetine

(depression/anxiety), lisinopril (high blood pressure), hydrochlorothiazide (high blood pressure),

and aspirin (for cardiac health).  See Exhibits 3A-D.

### D.    Mr. Awan's Lack of Personal Motive to Commit an Act of Terrorism

Although the Second Circuit held that Mr. Awan's personal motivations are not relevant

in determining the applicability of § 3A1.4, his motivations are highly relevant for sentencing

under § 3553(a).  Quite simply, Mr. Awan did not have the pernicious mind state of a person

typically involved in crimes related to terrorism.

Judge Sifton thoroughly evaluated Mr. Awan's motivations in this case.  Judge Sifton

16

conducted pretrial hearings, trial proceedings, and the sentencing hearing.  Judge Sifton also permitted the parties numerous opportunities to be heard, both in writing and in court, concerning the sentencing issues.  As acknowledged by the Supreme Court in Gall, "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record."  128 S. Ct. at 597. "The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court." Id. at 597 (citation omitted).  "[D]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do."  Id. at 598 (quoting Koon v. U.S., 518 U.S. 81, 98 (1996)).

At the sentencing hearing, Judge Sifton initially addressed the outstanding Guidelines issues and stated the following:

> The Government argues, as is seems to me they might have argued earlier, but I'm prepared to consider it given the novelty of the issue that I should have considered the related conduct guidelines in determining whether Mr. Awan was motivated in committing this offense by a desire to influence the Government of India by acts of terrorism and the argument on examination falls of its own weight.
>
> What the related conduct guidelines counsel, as the name of the adjustment suggests, is consideration of the actions and omissions -- the conduct, in other words, of other members of jointly undertaken activity in determining what the appropriate offense level is and what appropriate adjustments should be. It does not and has not been interpreted to mean that a defendant becomes vicariously liable for the motivations or for the intent of other members of jointly undertaken activity and there's a good reason for that.

17

> This is as, I think all parties have recognized from the beginning, what might be considered a Draconian increase in the seriousness of the offense and the characteristics of the defendant for sentencing purposes. The rationale for that, as the Court of Appeals has in this circuit indicated, is that persons motivated by a desire to change government or to influence the conduct of governments are not likely to be deterred or reformed by any customary sentence.
>
> They are anticipated, rightly or wrongly, to return to the same political beliefs and motivations after imprisonment that they had before they went in – rationale that we're familiar with in the so-called "War on Terror" where people are incarcerated without a definite end of their sentence with a rationale that they will return to the "war." So, it is important in considering whether to apply this terrorism adjustment to determine the state of mind and the intentions and the motivation that the individual who's being sentenced to determine whether this is a case of real terrorism, as I think one of the Congress's reports phrases it, that is, a case in which the conduct is so extreme and so strongly believed that it will not be changed or reformed by imprisonment and the only remedy is a substantial incapacitation of the defendant to prevent his returning, as it were, to the front lines. I don't think that is this kind of case.

T 4-6 ("T" denotes Sentencing Hearing, September 12, 2007).

Judge Sifton further found that "having looked at the case in its entirety, there is simply not sufficient evidence for me to conclude that Mr. Awan had, or for that matter, continues to have an intent to battle with the Governments of India or Pakistan to influence their conduct in any respect." T 6.

In short, Judge Sifton characterized Mr. Awan's motivations as follows:

> Mr. Awan, as the government has just mentioned, is a skillful perpetrator of fraud, a fixer, and -- as his conversations with his others that were recorded in prison, a boaster; a salesman and a -- one has to say -- "a terrorist groupie."

18

> His motivation in this offense appears to have been to drop names and associate with people in power, people with reputations, and that, to a large extent, explains his offense or what motivated his offense.

T 20.

The Second Circuit gave credence to Judge Sifton's assessment of Mr. Awan's motivations and lack thereof by remarking:

> Awan may have been motivated, as the district court found, by a desire for the prestige and potential influence obtained by associating with a terrorist like Panjwar, while lacking "any political motivation and, in particular, any motivation having to do with India."

Awan, 607 F.3d at 317 (citing Awan, 2007 WL 2071748, at *4 n. 20).

**E.      The Court Should Avoid Unwarranted Sentencing Disparities**

Under § 3553(a), The Court should avoid unwarranted sentencing disparities.  Any sentence for Mr. Awan approaching that recommended by the Department of Probation would result in a gross disparity, both in relation to other defendants generally and to the coconspirators in this case specifically.

As noted above, Judge Sifton specifically stated that "protection and deterrence remain a serious factor here but not to the extent of warranting the kind of lifetime or close to a lifetime sentence that would result from an adjustment of the sort initially recommended by the Probation Department."  T 21-21.  A lifetime or close to a lifetime sentence is not warranted in this case where Mr. Awan did not undertake or plan any acts of violence or agree to fund any specific act of violence.

The most culpable coconspirators in this case testified as cooperating witnesses for the government.  Gurbax Singh and Baljinder Singh arguably were in the highest echelons of the KCF in the United States.  Mr. Awan, a Muslim, never was a member of the KCF.  It is

instructive to examine the respective culpability and punishment of Gurbax Singh and Baljinder Singh in weighing the appropriate sentence for Mr. Awan.

### 1.   Gurbax Singh

Gurbax testified that he has been a member of the KCF since 1987. TT 169. Gurbax testified that for years he has worked closely with Parmjit Singh Panjwar ("Panjwar"), the leader of the KCF. TT 175-180. Gurbax testified that he entered the United States in 1990 after lying on his asylum application. See TT 180-184.

Gurbax acknowledged that he lied and bribed his way into the United States, lied on his asylum application, lied on his application to become a U.S. citizen, and lied in numerous F.B.I. interviews. TT 180-184; 199; 255-259; 262; 265-267. At the time of trial, the Indian government was seeking Gurbax's extradition for his role in an armed attack on a police station in Kairon, India. TT 281-284.

Gurbax testified that he was involved in raising money in the United States for Panjwar and the KCF. TT 197-198; 202; 244. Gurbax testified that he helped select Baljinder Singh ("Baljinder") to be president of the Khalistan Federation ("KF"), which was to function as a front group for raising money for the KCF. TT 203-204; 244-245.

Gurbax testified that he hosted two fundraisers. TT 208. Gurbax testified that he and Baljinder told potential donors that any donations would go for peaceful and religious endeavors, such as maintaining a radio station dedicated to Sikh programming and building new Sikh temples. TT 210-211; 245-248. Gurbax testified that only Sikhs participated in the fundraising meetings and that Mr. Awan never attended any of the fundraising meetings or conference calls. TT 253. Gurbax, who spoke to Panjwar on the telephone at least 200 times, acknowledged that he and Panjwar never discussed or spoke about Mr. Awan. TT 263.

Gurbax testified that he has seen Mr. Awan on only two previous occasions. Gurbax testified that he first saw Mr. Awan in either 1999 or 2000 after one of the fundraisers that Gurbax hosted. TT 208; 212-213; 254. Gurbax testified that $2,000 to $2,500 was collected at that fundraiser. TT 212. According to Gurbax, he and Baljinder drove to a house on Long Island after the fundraiser. TT 213. Gurbax did not know the name of the person they were going to go see or the address. TT 213. Gurbax testified that he and Baljinder went to Long Island to give money raised by the KF to a person who would give the money to Panjwar. TT 212-213.

Gurbax testified that Mr. Awan is the person he met on Long Island that night. TT 213-214. Gurbax testified that he cannot remember any conversation he had with Mr. Awan; there was no discussion of what the money was to be used for or to whom it was to be given. TT 215-217.

Gurbax testified that he never saw Mr. Awan again until years later when they were both incarcerated at the MDC in 2006. TT 221-227; 254. Gurbax testified that upon meeting Mr. Awan at the MDC, Gurbax told Mr. Awan that the money he previously gave Awan was for a radio station. TT 263.

While some sentencing benefit would be expected for Gurbax's cooperation with the government, there must be some proportionality. Unlike Mr. Awan, Gurbax received many benefits, including only facing one count of material support for his instrumental role in the conspiracy. As a result of Gurbax's cooperation with the government, the government has dismissed the charge of lying to federal officials, a crime for which Gurbax was arrested in February of 2006. See TT 271. Gurbax pleaded guilty to 18 U.S.C. § 2339A, a charge for which he faced up to 15 years in prison. TT 200; 272. At the time of trial, Gurbax hoped to receive a

5K1.1 letter as well as legalization of his and his family's presence in this country, thus avoiding deportation to India.  TT 200-201; 272-274; 283-285.

According to the ECF court file, Gurbax was permitted to remain at liberty not only during the trial, but also did not have to surrender to authorities until June 8, 2009.  Gurbax was sentenced on the one count of violating 18 U.S.C. § 2339A and received a sentence of 36 months in prison.  See Exhibit 4.  According to the BOP Inmate Locator web site, the only "Gurbax Singh" in the system was released on November 29, 2011.

### 2.    Baljinder Singh

Baljinder first came to the United States in 1989.  TT 397.  Baljinder began supporting the KCF in 1995.  TT 405.  Baljinder testified that he was President of the KF.  TT 420-21.  Baljinder testified that, along with Gurbax, he raised money in the United States to send to Panjwar for the Khalsa cause.  TT 405; 420-421; 424; 463.  Baljinder testified that he raised money for the KCF beginning in 1997 or 1998 and stopped in either 2000 or 2001.  TT 405-406.  Baljinder testified that Mr. Awan was never present at any of the fundraising meetings that Baljinder organized or attended.  TT 457-458.  Baljinder testified that only Sikhs participated in the fundraising conference calls and that Mr. Awan never participated in any such conference call.  TT 458.

Baljinder attended Gurdwaras (Sikh religious institutions) to raise money.  TT 422.  Like Gurbax, Baljinder deceived financial donors as to what activities the donated funds would eventually finance.  Baljinder testified that donors did not want to hear about bombing campaigns, so fundraising pitches centered around legal endeavors, such as building radio stations and Sikh temples.  TT 460-461.

Baljinder testified that he participated in only two or three fundraisers at his house. TT 435. Baljinder testified that the first meeting was in 1997 or 1998. Without giving specific dates, Baljinder testified that, shortly after two of the fundraisers, Baljinder participated in giving the raised funds to Mr. Awan. TT 437.

When testifying, Baljinder did not provide a date as to when he met or gave money to Mr. Awan. Baljinder testified that he first met Mr. Awan after one of the fundraisers. See e.g., TT 437-438. Baljinder testified that he drove to Long Island with Gurbax and Jatinder Singh, who never testified at trial. TT 438-439. According to Baljinder, upon arriving at Mr. Awan's house, they entered and talked with Mr. Awan. TT 440. Baljinder testified that Mr. Awan was the only person at home when they arrived. TT 440. Mr. Awan described having a personal relationship with Panjwar. TT 440-441. Baljinder testified that he had brought $2,000 from the fundraiser to give to Mr. Awan. TT 439. At no time did the parties discuss what activities the money would finance. At no time did Mr. Awan state that he was going to send the money in order to facilitate any type of violent act. TT 480-482.

Baljinder testified that he met Mr. Awan a second time in Queens. TT 442. Baljinder never provided a date for when this second meeting occurred. Baljinder testified that he brought $2,000 to Mr. Awan. TT 443. In describing their conversation, Baljinder provided no testimony that he and Mr. Awan ever discussed anything Panjwar intended to do with the money. TT 442-446. Baljinder testified that he gave Mr. Awan pictures of five Sikh saints to deliver to Panjwar as well. TT 446-447.

Like Gurbax, Baljinder conceded that he has lied several times to federal investigators and on official government applications. TT 455-456; 465; 483-489. Baljinder lied on his initial immigration application in 1989. TT 403; 412; 483-489. Upon having his application denied for

lying, Baljinder submitted a new application with a fake name and bogus biography. TT 412-419; 471-472. Baljinder has been arrested two times in India, TT 399-400, and, as of the time of the trial, has pleaded guilty to violating 18 U.S.C. § 2339A and to lying to federal officials. TT 407; 466-468. Although he was facing up to 15 years in prison, TT 408, Baljinder hoped at trial to receive a 5K1.1 letter from the government, as well as assistance to avoid deportation to India and to secure lawful residence in the U.S. for himself and his family. TT 410; 468-469.

There is no public court file for Baljinder Singh on ECF so it is unknown by the defense what, if any, sentence Baljinder received for violating 18 U.S.C. § 2339A and for lying to federal officials.

It would be manifestly unjust for Mr. Awan to be sentenced to a term of imprisonment several multiples higher than Gurbax Singh. If the Probation Department's recommendation is followed, Mr. Awan would receive a sentence *fifteen times* higher than Gurbax Singh. (45 years divided by 36 months). Such a disparity is absolutely unwarranted when Mr. Awan was significantly less culpable than either Gurbax and Baljinder.

A sentencing judge should consider "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall, 128 S. Ct. at 598 (quoting Koon, 518 U.S. at 113). Looking at the totality of evidence and considering all the purposes of sentencing, including the need to avoid unwarranted sentencing disparities, the Court should consider imposing a sentence for Mr. Awan that is as close as possible to the sentences imposed upon Gurbax Singh and Baljinder Singh.

**Conclusion**

Accordingly, for all the reasons set forth above, it is respectfully submitted that the Court

impose a reasonable sentence that that is sufficient but not greater than necessary to fulfill the

objectives of sentencing.

Dated: February 3, 2012
       New York, New York


                                    Respectfully submitted,


                                    _____/S/_____
                                    SEAN M. MAHER
                                    *Counsel for the Defendant*
                                    The Law Offices of Sean M. Maher, PLLC
                                    233 Broadway, Suite 801
                                    New York, NY 10279
                                    (212) 661-5333
                                    (212) 227-5808 fax